Louise CROSBY, Carol Dockery, Elisha Hearn, Richard Hodas, Bernice and Henry Kaczynski, and Ann Locklear, Plaintiffs,

v.

Coleman A. YOUNG, Mayor of the City of Detroit, Detroit Economic Development Corporation, City of Detroit, City of Hamtramck, Samuel R. Pierce, Jr., Secretary of Housing and Urban Development, and General Motors Corporation, Defendants.

Civ. A. No. 81–70844.

United States District Court, E. D. Michigan, S. D.

April 24, 1981.

---

Bruce J. Terris, Terris & Sunderland, John Cary Sims, Washington, D. C., Hugh M. Davis, Jr., Detroit, Mich., for plaintiffs.

William G. Christopher, Honigman, Miller, Schwartz & Cohn, Joseph M. Baltimore, City of Detroit, Asst. Corp. Counsel, Detroit, Mich., for defendants Coleman A. Young, Mayor of Detroit, City of Detroit, and Corinne Gilb, City Planning Commission.

Eric Lee Clay, Detroit, Mich., for Detroit Economic Development Corp.

George Matish, Detroit, Mich., Aloysius J. Suchy, Harper Woods, Mich., for City of Hamtramck.

David Maurer, Asst. U. S. Atty., Detroit, Mich., for Samuel R. Pierce, Jr., Secretary of Housing & Urban Development.

Ronald S. Holliday, Detroit, Mich., for General Motors Corp.

## OPINION

FEIKENS, Chief Judge.

This case is before me for the resolution of three claims brought pursuant to the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321 *et seq.* First, plaintiffs claim that Detroit and Hamtramck failed to consider alternatives to the proposed Central Industrial Park ("CIP"), contrary to the statutory requirements of Section 4332(2)(C)(iii). Next, it is plaintiffs' contention that the Department of Housing and Urban Development ("HUD") authorized the release of Section 108 loan guarantee funds before the final environmental impact statement ("EIS") was prepared, thus contravening the purpose of NEPA as expressed in Section 102. Finally, plaintiffs argue that the delegation of authority to a grant or loan applicant, here Detroit and Hamtramck, by the Department of Housing and Urban Development is improper under the statute and that the HUD regulations that permit this delegation are in violation of NEPA.

## BACKGROUND

*State Litigation*

General Motors Corporation ("GM") announced in the spring of 1980 that it would close its Cadillac plant and Fisher Body plant in 1983. GM also announced, however, the construction of a new automobile plant and expressed a desire to build it in

Detroit if a suitable site could be located. Coleman Young, Detroit's Mayor, began an aggressive campaign to convince GM that a site could be found and worked hard to keep the automobile manufacturer in the City. During the next several months, Detroit analyzed numerous areas to determine if there would be an appropriate place to locate the plant. It finally focused on the old Dodge Main site, located on the border of Hamtramck and Detroit. However, for this site to be large enough to encompass a modern plant, approximately 100 acres of residential and commercial land needed to be acquired from an area that had become known as Poletown. On October 31, 1980, the Detroit City Council approved the location of the CIP in the Detroit/Hamtramck area. (Sheldon Affidavit, Attachment 34).

Poletown Neighborhood Council, an unincorporated association of approximately 300 residents, and ten individuals thereupon initiated an action in the Wayne County Circuit Court on October 31, 1980, by petitioning for a temporary restraining order to enjoin Detroit and the Detroit Economic Development Corporation ("DEDC") from proceeding with the condemnation of the Poletown properties. (Sheldon Affidavit, Attachment 35). The injunction was denied and an expedited hearing was scheduled for November, 1980 before the Honorable George Martin, a state circuit court judge. Detroit commenced negotiations with the Poletown property owners for acquisition of their property and began condemnation proceedings of those parcels that their owners were unwilling to sell.

At the hearing in the Wayne County Circuit Court, plaintiffs challenged the constitutionality of the Michigan Quick Take Statute, M.C.L.A. 213.51 et seq., and the Economic Development Corporations Act, M.C.L.A. 125.1601 et seq. The hearing centered on whether Detroit abused its discre-

tion in determining that the condemnation proceedings were for the public necessity. Judge Martin concluded that the legislature, in authoring the Economic Development Corporations Act, "specifically contemplated the exercise of the sovereign power of eminent domain for economic development projects including industrial parks." [1] (Defendant Detroit Economic Development Corporation's Memorandum of Points and Authorities in Support of Motion for Summary Judgment, Exhibit B, p. 12). Judge Martin also concluded that the Michigan laws were constitutional because the power of eminent domain is justified when property is taken for a public purpose, that the notion of a public purpose is not a static definition but, rather, an evolving doctrine, and that the public purpose is served because the condemnation is necessary for Detroit and DEDC to "alleviate and prevent conditions of unemployment". *Id.*, p. 14.

Plaintiffs appealed directly to the Michigan Supreme Court on two issues. First, the constitutionality of the Economic Development Corporations Act was challenged on grounds that it permitted a taking of private property by a governmental agency for a private purpose. The second claim alleged that the Michigan Environmental Protection Act, M.C.L.A. 691.1201 et seq., was violated because Poletown is a "protected natural resource". Pending decision, the Michigan Supreme Court enjoined Detroit from taking any further action with regard to the acquisition and condemnation of property in Poletown. The Court then upheld the constitutionality of the statute by a 5–2 vote, stating that a public purpose could include the creation of jobs and revitalization of the economy. Additionally, the Court concluded that the Michigan Environmental Protection Act applied to natural resources, such as air, water, vegetation,

---

1. The term "project" is defined in M.C.L.A. 125.1603(e) as "land and existing or planned improvements suitable for use by any industrial or commercial enterprise or a replacement housing project incidental thereto, including all necessary buildings or structures suitable for and intended for or incidental to use as an

industrial or commercial enterprise, including a replacement housing project incidental thereto, and all necessary machinery, furnishings, and equipment necessary, suitable, intended for or incidental to a commercial, industrial, or residential use in connection with the buildings or structures."

and other biological or geological resources, and did not encompass the "social and cultural environment". (Defendant Detroit Economic Development Corporation's Memorandum of Points and Authorities in Support of Motion for Summary Judgment, Exhibit C). When the Court filed its opinion on March 13, 1981, the stay was lifted and Detroit was able to resume the condemnation of property in Poletown. Title to the last of the properties was acquired by Detroit on March 27, 1981.

*Federal Litigation*

Seven individuals who are Poletown residents filed suit in this court on March 17, 1981, setting forth the three previously described claims for relief under NEPA. Initially, plaintiffs sought a preliminary injunction against defendants to prevent demolition of property that had been acquired by Detroit and, further, to enjoin its acquisition of parcels to which title had not yet been passed. A conference was held March 24, 1981 on the record, at which all parties were present. I decided that the defendants should have an opportunity to file pretrial motions until Monday, March 30, and the hearing on all motions was scheduled for April 1, 1981.

Plaintiffs stipulated to the dismissal of defendants Corinne Gilb, since she acted as an agent of Mayor Young, and the Detroit City Planning Commission, because it did not participate in the preparation of the environmental impact statement. On April 1, I heard motions for summary judgment by Detroit, the Detroit Economic Develop-

ment Corporation, and Samuel Pierce, Secretary of the Department of Housing and Urban Development, on all three counts. Defendant General Motors moved to dismiss the claims against it since it has no obligations pursuant to NEPA. I denied the latter motion because GM has been intimately involved with the facts leading to this lawsuit and it would be necessary to incorporate them into any resolution of this dispute. Since all parties agreed that Counts II and III could be decided as matters of law, I have done so in this opinion. The parties also agreed that I could review the state testimony, affidavits and attached exhibits as part of this record. I decided to take the motions for summary judgment on Count I under advisement and proceed with the taking of testimony not only to complete the record but also to decide Count I on the merits. My purpose in taking testimony was to effectuate a final decision in an atmosphere that indicated that time was of the essence. Over forty hours of testimony were taken in nine days.

## I.

### A. *The Environmental Impact Statement*

Plaintiffs' first claim alleges that defendants failed to analyze all reasonable and feasible alternatives to the CIP project in the environmental impact statement. They contend that this constitutes a violation of NEPA, particularly § 4332(2)(C)(iii) and § 4332(2)(E).[2] Plaintiffs have argued that

---

2. 42 U.S.C. § 4332 states in part:

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall

. . . .

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and

the use of structured or rooftop parking; relocations of the water retention pond, the railroad marshalling yards and the automobile haulaway yard; and re-siting of the power plant would result in the use of a smaller site and, therefore, retention of many of the homes and businesses in Poletown.

The purpose of an environmental impact statement has been stated in *Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission,* 449 F.2d 1109 (D.C.Cir.1971). The court stated:

> This requirement [42 U.S.C. § 4332(D), renumbered § 4332(E)], like the "detailed statement" requirement, seeks to ensure that each agency decisionmaker has before him and takes into proper account all possible approaches to a particular project (including total abandonment of the project) which would alter the environmental impact and the cost-benefit balance. Only in that fashion is it likely that the most intelligent, optimally beneficial decision will ultimately be made. Moreover, by compelling a formal "detailed statement" and a description of alternatives, NEPA provides evidence that the mandated decision making process has in fact taken place and, most importantly, allows those removed from the initial process to evaluate and balance the factors on their own.

449 F.2d at 1114. A balancing analysis is required by NEPA, and the impact statement is the primary document necessary in that analysis. According to Senator Jackson:

> Subsection 102(C) establishes a procedure designed to insure that in instances where a proposed major Federal action would have a significant impact on the environment that the impact has in fact been considered, that any adverse effects

which cannot be avoided are justified by some other stated consideration of national policy, that short-term uses are consistent with long-term productivity, and that any irreversible and irretrievable commitments of resources are warranted.

115 Cong.Rec. (Part 21) 29055 (1969), *quoted in Calvert Cliffs', supra,* 449 F.2d at 1113–1114, note 9.

These remarks have often caused NEPA to be referred to as an environmental full disclosure law. The United States Court of Appeals for the Sixth Circuit, in interpreting the many challenges to environmental impact statements, has concurred in this interpretation. For example, in *Environmental Defense Fund, Inc. v. Tennessee Valley Authority,* 339 F.Supp. 806 (E.D. Tenn.1972), *aff'd,* 468 F.2d 1164 (6th Cir. 1972), the lower court was affirmed in its holding that an EIS was meant to aid the decisionmaker and to advise the public of the environmental impact of the proposed action. Citing *Environmental Defense Fund, Inc. v. Corps of Engineers of the United States Army,* 325 F.Supp. 749, 759 (E.D.Ark.1971), the court held:

> At the very least, NEPA is an environmental full disclosure law. The Congress, by enacting it, may not have intended to alter the then existing decisionmaking responsibilities or to take away any then existing freedom of decisionmaking, but it certainly intended to make such decisionmaking more responsive and more responsible.

339 F.Supp. at 810. This reasoning was also approved by the United States Court of Appeals for the Eighth Circuit which interpreted § 4332 as a method by which courts could "determine objectively whether federal officials have carried out the mandate of Congress to accord a high priority to envi-

---

the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

. . . .

  (E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources.

ronmental factors." 468 F.2d at 1175. *See also, City of Romulus v. County of Wayne,* 392 F.Supp. 578, 586 (E.D.Mich.1975).

Full disclosure, in the past, has often meant that the preparer of an environmental impact statement was forced to include documents of every possible nature, making the statement cumbersome, unwieldy, and of speculative use to the decisionmaker or the public. *See, e. g., Environmental Defense Fund, Inc. v. Tennessee Valley Authority,* 371 F.Supp. 1004 (E.D.Tenn.1973), where the environmental impact statement comprised three volumes and more than 600 pages. The potential magnitude of any EIS was recognized by the Council on Environmental Quality ("CEQ" or "Council") in its regulations:

> The text of final environmental impact statements (e. g., paragraphs (d) through (g) of § 1502.10) shall normally be less than 150 pages and for proposals of unusual scope or complexity shall normally be less than 300 pages.

As a result, the courts have used a "rule of reason" in their analysis of the adequacy of the environmental impact statement. An agency cannot be expected to document every bit of data that was incorporated into its decision. *Natural Resources Defense Council, Inc. v. Tennessee Valley Authority,* 502 F.2d 852, 854 (6th Cir. 1974); *Environmental Defense Fund, Inc. v. Corps of Engineers,* 348 F.Supp. 916 (N.D.Miss.1972), *aff'd,* 492 F.2d 1123 (5th Cir. 1974).

I do not mean to indicate that an agency, in this case Detroit and Hamtramck, should be able to justify an imperfect analysis by stating a page limitation.

> NEPA requires that an agency must—to the *fullest* extent possible under its other statutory obligations—consider alternatives to its actions which would reduce environmental damage. That principle establishes that consideration of environmental matters must be more than a *pro forma* ritual. Clearly, it is pointless to "consider" environmental costs without also seriously considering action to avoid them.

*Calvert Cliffs', supra,* 449 F.2d at 1128 (emphasis in original). I do, however, believe that a full analysis of alternatives may be presented without a complete, thorough documentation of every piece of data in the statement itself. This is substantiated by CEQ's regulation permitting "incorporation by reference", 40 C.F.R. § 1502.21. The incorporated material is cited in the EIS and described briefly. It must be available for public reference. The express purpose of this is to decrease the bulk of the EIS without influencing the caliber of review. It is with this background that I turn to plaintiffs' first claim.

Section 4332(2)(C) sets forth the principal elements of an environmental impact statement. The dispute in this case centers about § 4332(2)(C)(iii), "alternatives to the proposed action". As plaintiffs suggest, the consideration of alternatives is the "heart" or "linchpin" of the EIS. 40 C.F.R. § 1502.-14; *Monroe County Conservation Council, Inc. v. Volpe,* 472 F.2d 693, 697–698 (1972); *Natural Resources Defense Council, Inc. v. Callaway,* 524 F.2d 79, 92 (2d Cir. 1975). Without the consideration of alternatives, the EIS deteriorates into a justification document for the agency's action. As CEQ describes it, the "environmental impacts of the proposal and the alternatives [should be presented] in comparative form, thus sharply defining the issues and providing a clear basis for choice among the options." 40 C.F.R. § 1502.14.

It is not the fact that alternatives were not considered that is in question here, but rather the nature and extent to which the alternatives must be examined. CEQ has promulgated regulations with which agencies must comply in the preparation of an EIS. Exec. Order No. 11991, *reprinted in* [1977] U.S.Code Cong. & Ad.News 4669. These regulations are entitled to substantial deference. *Andrus v. Sierra Club,* 442 U.S. 347, 358, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979); *Warm Springs Dam Task Force v. Gribble,* 417 U.S. 1301, 1309–1310, 94 S.Ct. 2542, 2546–2547, 41 L.Ed.2d 654 (1974) (Douglas, J., in chambers). The alternatives that CEQ has recommended for examination are the preferred alternative, all

reasonable alternatives (within or without the lead agency's jurisdiction), a no-action alternative, and all mitigation measures. 40 C.F.R. § 1502.14.

Plaintiffs do not quarrel with the point that defendants have discussed the preferred alternative, the no-action alternative, and the mitigation alternative. Nor do they disagree (at least not openly) with the decision of Detroit and Hamtramck to build the plant in the general area of the project site. The principal thrust of plaintiffs' complaint is that Detroit and Hamtramck failed to adequately discuss and consider *reasonable* alternatives within the scope of the final EIS.

Not all alternatives are reasonable. The regulations are clear that only reasonable alternatives need to be rigorously explored and objectively evaluated. 40 C.F.R. § 1502.14(a).

> NEPA is premised on the assumption that all *reasonable* alternatives will be explored by the agency. *Natural Resources Defense Council, Inc. v. Morton, supra* [458 F.2d 827 (D.C.Cir.1972)] at 837. There is no need however to consider alternatives of speculative feasibility. *Natural Resources Defense Council, Inc. v. Callaway,* 524 F.2d 79, 93 (2d Cir. 1975).

*Concerned About Trident v. Rumsfeld,* 555 F.2d 817, 825 (D.C.Cir.1977). A definition of what constitutes a "reasonable alternative" is somewhat elusive. The court in *Natural Resources Defense Council, Inc. v. Morton,* 458 F.2d 827, 837 (D.C.Cir.1972), discussed this requirement at length, stating:

> The requirement in NEPA of discussion as to reasonable alternatives does not require "crystal ball" inquiry. Mere administrative difficulty does not interpose such flexibility into the requirements of NEPA as to undercut the duty of compliance "to the fullest extent possible". But if this requirement is not rubber, neither is it iron. The statute must be construed in light of reason if it is not to demand what is, fairly speaking, not meaningfully possible, given the obvious, that the resources of energy and research—and

time—available to meet the Nation's needs are not infinite.

. . . .

> In the last analysis, the requirement as to alternatives is subject to a construction of reasonableness, and we say this with full awareness that this approach necessarily has both strengths and weaknesses. Where the environmental aspects of alternatives are readily identifiable by the agency, it is reasonable to state them— for ready reference by those concerned with the consequences of the decision and its alternatives. As already noted, the agency may make references to studies already made by other agencies (including impact statements) or appearing in responsible journals.

In that case, the court held that it was inappropriate for the Department of the Interior to restrict its analysis of alternatives to those that the agency could adopt. The court, however, did not require the agency to examine alternatives for which technology was not yet available or which were felt to be dependent on other environmental safeguards.

The determination of reasonableness also depends on the particular context of the planned project and the amount of time and resources that the agency has available.

A court must use reason and assess the results with an eye to practicality so as not to further tie up the governmental bureaucracy with red tape. However, a court should engage in a "substantial inquiry" to ensure that the agency has rigorously and objectively fulfilled its obligations. In the same fashion that agencies must continually update and reevaluate their policies, they must continue to reevaluate such aspects as mitigation, impact and the scope of a proposed project, even if an acceptable impact statement has been prepared, reviewed and accepted. It may well be difficult as a practical matter for the courts to determine where mere consideration of an alternative is sufficient as contrasted with when actual mitigation is required. *As a basic rule, if the agency has properly used its own*

expertise and that contributed by other expert agencies, all acting fully and reasonably within their own respective jurisdictions, *then the final balance should not be disturbed, even if a court would have personally arrived at a different result.* (emphasis added).

*Sierra Club v. Froehlke,* 359 F.Supp. 1289, 1345 (S.D.Tex.1973), *aff'd,* 534 F.2d 1289 (8th Cir. 1976). *Accord, National Center for Preservation Law v. Landrieu,* 496 F.Supp. 716, 725; *Monarch Chemical Works, Inc. v. Exon,* 452 F.Supp. 493 (D.Neb.1978), *aff'd sub nom. Monarch Chemical Works, Inc. v. Thone,* 604 F.2d 1083 (8th Cir. 1979); *Mason County Medical Association v. Knebel,* 563 F.2d 256 (6th Cir. 1977).

Remote or highly speculative consequences are not required to be discussed in the impact statement. *Aertsen v. Landrieu,* 637 F.2d 12 (1st Cir. 1980); *Concerned About Trident, supra,* 555 F.2d at 828. Neither can an agency be held responsible for failing to include "every alternative device and thought conceivable by the mind of man". *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519 (1978) at 551, 98 S.Ct. 1197 at 1215, 55 L.Ed.2d 460.

> To make an impact statement something more than an exercise in frivolous boilerplate the concept of alternatives must be bounded by some notion of feasibility.
>
> . . . .
>
> Time and resources are simply too limited to hold that an impact statement fails because the agency failed to ferret out every possible alternative, regardless of how uncommon or unknown that alternative may have been at the time the project was approved.

435 U.S. at 551, 98 S.Ct. at 1215. *See also, Life of the Land v. Brinegar,* 485 F.2d 460 (9th Cir. 1973), *cert. denied,* 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). The environmental impact statement need not be exhaustive but it must contain sufficient information to permit a reasoned choice of alternatives *"so far as environmental aspects are concerned." Natural Resources*

*Defense Council Inc. v. Morton, supra,* 458 F.2d at 836 (emphasis added).

■ To summarize, an environmental impact statement must be succinct and examine all reasonable and feasible alternatives, and provide enough information to make a balanced, well-reasoned decision as to the proposed project. As to alternatives, their range is governed by an agency's limitations of the amount of time and resources from which it can develop and examine the choices that are, or may be, available to it.

■ The scope of judicial review of the environmental impact statement must also be analyzed. The review of the sufficiency of an agency's environmental impact statement is not limited to the four corners of the final EIS. To determine if an agency has met the mandate of NEPA, a court must review the entire administrative record before it, including the external documents incorporated by reference into the final EIS. Without the entire record before it, a court cannot determine if an environmental assessment is reasonable. *National Center for Preservation Law, supra,* set forth the standard of review as follows:

> *De novo* review is unwarranted in this type of case since the court must focus on administrative action which was clearly documented prior to the start of litigation. *See Upper Westfork River Watershed v. Corps of Engineers,* 414 F.Supp. 908, 916 (N.D.W.Va.1976), *aff'd,* 556 F.2d 576 (4th Cir. 1976), *cert. denied,* 434 U.S. 1010, 98 S.Ct. 720, 54 L.Ed.2d 752 (1978). The Fourth Circuit in *Fayetteville Area Chamber of Commerce v. Volpe,* 515 F.2d 1021 (4th Cir. 1975), stated that the focal point for judicial review should be the Administrative Record already in existence and not some new record made initially in the reviewing court. *Id.* at 1024, citing *Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). . . . In the case of *Asarco, Inc. v. EPA,* 616 F.2d 1153 (9th Cir. 1980), the Ninth Circuit Court of Appeals discussed in detail consideration of evidence outside of the Administrative Record. In that case the court noted that if an Administrative

Record does not contain a satisfactory explanation of the federal agency's action, the court may require through affidavit or live testimony further explanations from the agencies involved.

496 F.Supp. at 724.

■ The standard then which I must use in reviewing the adequacy of Detroit and Hamtramck's final impact statement is that of "reasonableness". Reason, with regard to the standard of review in an agency's environmental assessment procedure, entails an analysis whether the EIS was compiled in objective good faith and whether the resulting statement would permit a decisionmaker to fully consider and balance the environmental factors. *See also, National Center for Preservation Law, supra,* 496 F.Supp. 724, *citing County of Suffolk v. Secretary of Interior,* 562 F.2d 1368 (2d Cir. 1977). *Save Our Ten Acres v. Kreger,* 472 F.2d 463, 465 (5th Cir. 1973); *Natural Resources Defense Council, Inc. v. Morton, supra,* 458 F.2d at 837 (D.C.Cir.1972); *Environmental Defense Fund, Inc. v. United States Army Corps of Engineers,* 342 F.Supp. 1211 (E.D.Ark.1972), 470 F.2d 289 (8th Cir. 1972).

■ Application of the "reasonableness" standard is in accord with the notion that an agency is to use the information brought to its attention during the environmental analysis and develop plans that are consonant with the information so provided. The concept of alternatives is an evolving one, and one which requires an agency to explore more or fewer alternatives as they become better known and understood. *Vermont Yankee Nuclear Power Corp., supra,* 435 U.S. at 552–553, 98 S.Ct. at 1216–1217. Once an agency has made a decision, the only role for the court is to ensure that the agency has considered the environmental consequences of its action. It cannot interject itself into the area of discretion of the agency's executive regarding the choice of the action to be taken. *National Center for Preservation Law, supra,* 496 F.Supp. at 724; *Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227, 100 S.Ct. 497, 499, 62 L.Ed.2d 433 (1980), *citing*

*Kleppe v. Sierra Club,* 427 U.S. 390, 410, n. 21, 96 S.Ct. 2718, 2730, n. 21, 49 L.Ed.2d 576 (1976).

Plaintiffs have contended that Detroit and Hamtramck have failed to consider reasonable alternatives to the preferred project plan. I disagree. The record in this case is extensive and I will succinctly state my reasons for concluding that defendants reasonably proceeded with their environmental assessment, considered a variety of alternatives to the site plan, and complied with the substantive and procedural requirements of NEPA.

As early as July 16, 1980, the Cities of Detroit and Hamtramck decided to prepare an environmental impact statement because of the "large-scale nature of the project in a dense urban setting". The Notice of Intent to prepare an EIS was published in 45 Fed.Reg. 49361 (July 24, 1980). Identified within the notice were five perceived alternatives: clearance of the land and development of the site as an industrial park (the preferred alternative); residential or other reuse; smaller site; no build on that site; and no action.

Representatives of Resources Assessment Incorporated ("RAI") attended a "scoping" meeting on August 1, 1980 with the Environmental Protection Agency ("EPA"). Although a number of alternatives were discussed at that meeting, those that would result in the loss of tax revenues to Hamtramck from the reuse of industrial land were not preferred. The conferees concluded that the only reasonable alternative to accommodate this would be a planned industrial park totally within Hamtramck; EPA recommended detailed consideration of the preferred alternative (the CIP project), modifications to the preferred alternative, and a no-action proposal. On August 5, 1980, a similar meeting was held with HUD.

Several days later, on August 4 and 5, the first hearing was held to provide citizen participation in the planned application for the Section 108 loan guarantee. A citizen provided Detroit with three maps of proposed alternative locations that would not

require the relocation of persons south of East Grand Boulevard.

Public discussion of the project was provided through an all-day scoping session on August 14, 1980. This session was planned to accommodate those individuals who worked shifts or who would otherwise find it difficult to attend an evening session. The notice of the meeting stated that the environmental impact statement that was being prepared would be available for discussion. Included in the draft EIS were "information on the project, the environmental impact of the project, and *alternatives* to the project". Over 100 persons attended the meeting.

The hearing generated a list of concerns voiced by persons who live and work in Poletown. One of the concerns was the size of the parcel that was understood to be a condition for development. An area for response was provided on the list. Although the list was circulated throughout the community and at neighborhood churches, no responses were received by Detroit or RAI.

A meeting on August 15 was held by representatives of RAI with officials of GM. An attempt was made to elicit the reasons that GM required a specific size and configuration of the site. GM provided information about the expected truck and rail traffic, the way in which the assembly plant was designed, the number of automobiles and the length of time that they would be stored, and the size of the workforce. Questions pertaining to the feasibility of a multi-story plant and the use of the Dodge Main Plant were discussed as were expansion plans in regard to the expected life of the plant. All information developed was available to members of the public on request.

A formal scoping document was prepared and forwarded for review to all governmental agencies, individuals and private entities identified in the scoping process as having an interest in the CIP project. The document was prepared to determine the "scope and the significant issues to be analyzed in depth in the environmental impact state-

ment". 40 C.F.R. § 1501.7(a)(2). Nine different site alternatives were examined with particularity in the document. All but the Detroit/Hamtramck site were rejected for various reasons, including insufficient acreage and the relocation of more homes. Other alternatives were also considered. The reuse of Dodge Main was not found to be preferable because its principal reuse would be warehousing, a use for which there is little demand. The no-build and no-action alternatives presented similar disadvantages.

The scoping process focused the environmental impact statement on three principal alternatives: the preferred plan, a no-action plan, and a plan to mitigate some of the pollution resulting from traffic congestion. These alternatives were discussed in detail in the draft and final impact statements.

Plaintiffs do not challenge the adequacy of the analysis of the three alternatives. Instead, they argue that detailed analysis of other "reasonable" alternatives should also have been made. If there were other reasonable alternatives under the proofs that were presented in this case, plaintiffs would be correct. However, I do not see that the final EIS failed to consider any alternatives that were reasonable and feasible.

■ Environmental assessment and decisionmaking were never intended to be single-stage steps in an agency's review. *Aberdeen and Rockfish R.R. Co. v. Students Challenging Regulatory Agency Procedures,* 422 U.S. 289, 320, 95 S.Ct. 2336, 45 L.Ed.2d 191 (1975); *Calvert Cliffs', supra; Greene County Planning Board v. Federal Power Commission,* 455 F.2d 412 (2d Cir.), *cert. denied,* 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972). As an agency acquires more facts, it should be able to adapt its analyses to reflect the data. I cannot perceive of a more useless requirement than one that would require an agency to consider alternatives in detail that are not workable but are offered as substitutes for the proposed action. I mean that alternatives that are offered:

must be significant enough to step over a threshold requirement of materiality before any lack of agency response or consideration becomes of concern. The comment cannot merely state that a particular mistake was made . . . ; it must show why the mistake was of possible significance in the results.

*Vermont Yankee Nuclear Power Corp., supra*, 435 U.S. at 553, 98 S.Ct. at 1216, citing *Portland Cement Association v. Ruckelshaus*, 486 F.2d 375, 394 (D.C.Cir.1973), *cert. denied sub nom. Portland Cement Corp. v. Administrator, EPA*, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974).

The alternatives that were presented in the scoping document covered a broad range of sites and a variety of land uses. The discussion of various sites was kept open. The draft and the final environmental impact statements contained the description of the various sites identified in the scoping document and the reasons for their rejection. The reasons were substantiated by data indicating the number of homes and commercial properties that would be affected, the approximate size of the site, and the estimated cost of acquisition, relocation, demolition, and site improvements. (See Draft EIS, Part III; Final EIS, Part III). The scoping document states that:

> Some individual commentators did express support for locations, other than the proposed site, described under the preceeding [sic] "alternative sites" section. Nevertheless, since the commentators were unable to offer suggestions for avoiding the major constraints associated with each alternative (for example: inadequate size, the need to relocate larges [sic] and or more vigorous neighborhoods and businesses and the lack of environmental offsets), of feasible geographic option to the proposed site could bot [sic] be identified.

The prospect of a smaller site was addressed in the final EIS. (See Final EIS, III–16–III–22). Reasons for its non-selection were set forth. A more detailed analysis than this was not needed.

It is my opinion that agency proceedings are not forums to engage in unjustified obstructionism by making cryptic and obscure references to matters that "ought to be" considered. Nor may one fail to bring the matter to the agency's attention and then seek to have that agency determination vacated on the ground that the agency failed to consider matters "forcefully presented". *Vermont Yankee Nuclear Power Corp., supra*, 435 U.S. at 553–554, 98 S.Ct. at 1216–1217. A participant must offer constructive suggestions and not harass an agency. Agencies have an affirmative duty under NEPA to analyze alternatives, but it is irresponsible to require an agency to expend a sizeable amount of money, resources, and time to investigate frivolous claims. It is equally irresponsible to require an agency to detail alternatives that have been rejected as infeasible.

■ I find that Detroit and Hamtramck fulfilled their responsibility to examine all reasonable alternatives to the CIP project. The balancing tests set forth in *Calvert Cliffs', supra*, 449 F.2d at 1113–1114, were considered. Environmental factors were weighed against the proposed actions and, as a result, some of the actions were discarded. This is precisely the goal of NEPA and it is apparent that, considering the time and resources available to Detroit and Hamtramck, they proceeded with a thorough and procedurally correct environmental review.

I make the following specific findings of fact with regard to the adequacy and sufficiency of the environmental impact statement.

In April or May of 1980, GM informed Detroit that it would close its Cadillac and Fisher Body plants in 1983. Concomitantly, GM expressed a desire to construct a new assembly plant in Detroit if the City would be able to meet certain criteria. The principal criteria were: a rectangular shape of land, approximately 400–500 acres in size; access to a long-haul railroad; and ready availability. The Mayor of Detroit, Coleman Young, participated actively in searching for an appropriate site during the next

several months. In July, a reasonable site was found on the borders of Detroit and Hamtramck, the site in dispute in this lawsuit. This site is bounded on the north by the Grand Trunk and Conrail railroads, on the east by Conant and Mt. Elliott Avenues, on the south by the Ford Freeway, and on the west by Widman Avenue and the Grand Trunk railroad.

On July 16, 1980, the City of Detroit notified HUD of its intent to prepare an EIS because of the major impact of the demolition and the large amount of federal funds that were involved. The Notice of Intent was published in the Federal Register on July 24, 1980, pursuant to HUD regulations.

Throughout the month of August, a number of meetings were held that related to both the preparation of the EIS and the securing of federal financing for the project. Detroit and Hamtramck had retained the Ann Arbor offices of RAI to assist them in the preparation of the EIS. RAI representatives met with officials of the Environmental Protection Agency on August 1 and officials of HUD on August 5 to begin the scoping process. These meetings served to center the focus of the EIS on the major issues that should be addressed in the impact statement. The meeting with EPA identified three alternatives that it felt Detroit and Hamtramck should address in the EIS: the preferred alternative, alternatives that would mitigate any environmental effects, and a "no-action" alternative.

Public hearings were held on August 4, 5, and 14, 1980. The first meetings provided citizen participation to the city planners in accordance with the requirements of HCDA, 42 U.S.C. § 5301 et seq. Although they were held primarily to receive comments on amending Detroit's 1980–1981 Community Block Grants Application, discussion of the project was inescapable. Citizen comments were invited and Detroit officials responded to the inquiries at the meeting. Suggestions for three site configurations were submitted. The August 14 meeting had a workshop format and it con-

tinued throughout the day and evening as part of the scoping process. RAI representatives and officials from Detroit were available to answer questions and receive comments on the project. Issues discussed in the EIS, including alternatives to the proposal, were on the agenda.

A scoping document was prepared by Detroit to narrow the issues of the EIS. Nine alternative sites, including the Dodge Main/Poletown area, were examined and discussed according to their size, relocation impacts, and the relative costs of building a plant in that area. Other alternatives, such as the reuse of Dodge Main, a no-build alternative, a smaller site, and no-action alternative were discussed. Although all alternatives were kept open for discussion, three major choices were identified: the original proposal, modification of the proposal to incorporate a "ring-road" for traffic and pollution control, and a no-action alternative.

Over the next forty-five days, meetings were held to obtain the necessary information to prepare a draft EIS. These included meetings with GM to elicit critical data that needed to be incorporated into any alternative selected. Pursuant to a suggestion by HUD, RAI and Detroit investigated the feasibility of rooftop parking in order to preserve homes in the Poletown area. This suggestion, although explored in detail and reported in the final EIS, was found not to be preferable for daily operation and presented undesirable environmental consequences to the preserved residences.

Detroit met with HUD officials concerning the expediency of the project necessitating the commitment of federal funds by October 1, 1980. Acting pursuant to a recommendation by HUD, Detroit requested CEQ to approve alternate procedures for environmental review because emergency circumstances made it impossible to comply with normal procedures. The alternate procedures provided for early public participation in the planning procedures for the CIP project. These included the establishment of a Citizens' Advisory Board, local information centers and telephone numbers, and

a joint task force to help in educational relocation. Further, geriatric aid was available and considerable effort was planned to help in the relocation of families and businesses. The request was approved on September 24, 1980.

HUD approved the Section 108 loan guarantee for $60.5 million on October 1, 1980. Detroit applied for release of the funds, and certified that it had obtained approval for alternate arrangements to meet its NEPA responsibilities. The release was approved October 31, 1980.

On October 14, another public meeting was held to discuss amendment of Detroit's master zoning plan, a second amendment to its CDBG providing for a $39.5 million Section 108 loan, the application for an Urban Development Action Grant ("UDAG") by Hamtramck, and the proposed project plan. Detroit officials responded to comments received by citizens during that meeting.

The draft EIS was released on October 17, 1980, for which the public comment period extended to December 15, 1980. On December 22, 1980, a final EIS was released. The comment period for it extended until February 9, 1981. On February 10, Detroit published its "Record of Decision", selecting the mitigation alternative as environmentally preferred.

Residents of Poletown were informed throughout this process. The "Poletown Neighborhood Council" was formed as early as July 22, 1980 and met as often as weekly through November. It was a grass roots organization whose primary purpose was to preserve the neighborhood. The Citizens' District Council ("CDC"), proposed by Detroit in its alternate arrangements request to CEQ, was actually established at an August 22 meeting. The CDC conducted weekly meetings, all of which were attended by Detroit representatives to promote dialogue between the two organizations. Many members of the CDC also were members of the Neighborhood Council, and the organizations were kept current as to the actions of Detroit.

The CDC, at its October 22, 1980 meeting, was requested to review a copy of the draft EIS. Although meetings were held thereafter, only two comments on the EIS were made to the City. In late January, a sketch was submitted for consideration. The proposal was reviewed by Detroit but rejected because the site configuration, while retaining the area south of East Grand Boulevard, would not be workable because of the plant's operational requirements. On February 9, 1981, a lengthy comment on the final EIS was transmitted to Detroit by Richard Hodas, a member of the CDC. The remarks principally addressed the architectural significance of the Poletown buildings. No constructive suggestions were made by Hodas with regard to the configuration of the site in the letter or at any other time by any other persons during the five months that the project was reviewed.

Detroit received approval from HUD for a second Section 108 loan guarantee of $39.5 million on January 2, 1981. The funds were released February 13, 1981. On February 12, 1981, HUD approved a UDAG grant to Hamtramck in the amount of $30 million to assist in financing its portion of the project. Another UDAG application, of which $5 million would be earmarked for use in the CIP project, was submitted to HUD on February 27, 1981 by Hamtramck. No action has been taken by the agency on that grant application.

The environmental impact statement, draft dated October 17, 1980, and final, dated December 1980, are made a part of this opinion and incorporated by reference as Appendix A (draft October 17, 1980) and Appendix B (final draft December 1980).

### B. *Alternatives Suggested By Plaintiffs*

The gravamen of plaintiffs' claim is that Detroit failed to consider reasonable alternatives to the location and configuration of the CIP. Plaintiffs' principal concern is that this failure will necessitate the demolition of approximately 1340 commercial and residential structures and the relocation of

close to 899 families and 463 individuals.* To support their contention, plaintiffs introduced four alternatives to the proposed plan that, while incorporating the same components of the industry, would locate them in different configurations. All four alternatives in combination would preclude the destruction of Poletown, according to plaintiffs.

NEPA was *not* enacted to resolve issues arising from the use of the governmental power of eminent domain. Plaintiffs have already challenged the taking of their property in state court and it has been found to be constitutional. Plaintiffs do not raise any issues of eminent domain in this lawsuit and I decline to address this issue especially in the guise of a NEPA claim. Plaintiffs do raise questions as to the procedures by which the environmental impact statement was prepared, and it is those claims to which I now turn my attention.

The alternatives proposed by plaintiffs' expert witnesses have several features in common. All involve moving the location of the plant north of East Grand Boulevard, thus permitting, in theory, the major portion of Poletown to remain as it now is. No proposed alternative has changed the shape or square footage of the assembly plant, as presented in the final EIS, although in one plan the orientation of the plant is rotated 90 degrees. All plans relocate the power plant, decrease the area allocated for a haulaway yard, change the configuration of the railroad marshalling yard, provide for structured parking, and relocate the water retention pond. I am of the opinion that these alternatives are not reasonable due to the following factors.

*Relocation of the Power Plant*

Plaintiffs have suggested that the power plant should alternatively be located northwest or northeast of where it is presently proposed, a move of approximately 1,000 to 1,500 feet. Location of the plant on either those sites would place it immediately adjacent to residential neighborhoods. This would cause a hazard since flammable liquids are planned to be stored at its location

and a "coal shaker" would also be on the site. Use of the coal shaker, even in an area designed for noise abatement, would exceed the 65 dBA (decibel) limit required pursuant to HUD regulations.

Since the plant is coal-fired, substantial pollution may occur. Even with the most modern technology, particulates and sulfur dioxide will be deposited on the surrounding neighborhoods. Location of the plant as defendants propose will not preclude but will aid in the abatement of such hazards. (See Final EIS at IV–10, V–12 and F–17).

Other problems are entailed by locating the plant remotely from the assembly building. Energy would be lost through its transmission by either trestle or tunnel, resulting in increased fuel costs. The foundations that are present on the site due to Dodge Main could make the cost of a tunnel prohibitive. Additionally, although an economic reason may not be sufficient to outweigh environmental factors, the cost of building at least an additional 1,000 feet of trestle or tunnel is not inconsequential in the total decision.

*Haulaway Yards*

The haulaway yards are used for storage of completed automobiles and the assembly of "truckloads" and "trainloads" of new vehicles according to their destination. Plaintiffs' proposals separate the yards, providing access between them by below grade or above grade routes. In addition to creating additional road construction economic cost, separation could cause congestion of the traffic in the area since trucks will need to load vehicles from more areas. Location of the haulaway yards away from the railroad marshalling yards augments the truck traffic because automobiles need to be transported from the remote lots.

*Railroad Marshalling Yards*

Railroad access is important in the functioning of the planned assembly plant. Not only will the railroad be used to transport vehicles to their destination, but it is planned so as to provide storage and easy

---

* These figures reflect the situation in August 1980.

access to supplies within the plant as they become necessary during the assembly process.

For the plant to function adequately, first, approximately 200 feet of straight track is necessary outside each end of the assembly plant to facilitate switching cars and engines. Additionally, sufficient length of track must be provided to assemble a minimum of thirteen cars for supplies to the plant inside the plant. The layout is constrained, furthermore, by the turning radii of the cars in order to prevent them from derailing.

All of plaintiffs' plans reconfigure the marshalling yards. None of the plans provide for the requisite amount of "tangent" or straight track. Additionally, the location of the assembly plant north of East Grand Boulevard would require the tracks to curve at an angle greater than the length of the cars would accommodate, thus subjecting the entire project to the continual danger of derailment.

Further problems would be encountered in other aspects. The Grand Trunk Railroad and Conrail have adjacent tracks on the west side of the site. Conrail is the contractor for rail service at the new plant, but it is constrained from free location of its tracks by the need to acquire a switching casement from Grand Trunk. Complications also would result from plaintiffs' relocation of the power plant northwest of the railroad. In that location the plant would be difficult to service. It would displace the present yard from which the GM axle plant is serviced. Furthermore, it would require an engine to run approximately three miles south of the site to switch tracks. This could result in delays of four to five hours, and is not preferable since it is not efficient.

### Structured Parking

Much of the land that is saved in plaintiffs' plans results from the construction of parking garages. The difficulty with this proposal is two-fold: the attendant structural limitations and the traffic consequences.

Plaintiffs' plans locate the proposed garages in a manner that will increase the length of the walk to the plant for employees. Additionally, there is concern for security in the structures. Plaintiffs' plans also do not account for the area that would be necessary for ramp construction. The continuing expense of upkeep on the entrance and exit ramps and supporting beams in a winter climate also is troublesome.

Environmental concerns result from carbon monoxide "hot spots" that are present in the plaintiffs' proposed site. This was accommodated in the EIS by the mitigation alternative constructing a "ring-road" allowing a free flow of traffic which mitigation alternative plaintiffs reject. Plaintiffs' proposed alternatives would create a "traffic jam" when automobiles exit the structures onto the streets or enter and search for parking space. Plaintiffs also propose the use of the existing infrastructure of streets and the widening of St. Aubin and Mt. Elliott/Conant to boulevards. Evidence in the EIS shows that the carbon monoxide problem would not be alleviated, and that it was environmentally unsound. Other problems, such as crossing lanes of oncoming traffic and creating a new intersection approximately twenty feet below grade, cause me to rule out the reasonableness and feasibility of these alternatives.

### Water Retention Pond

The pond is used primarily for storm water runoff and, hence, is located on the lowest area of the site. There is little debate over the location of the pond. Although the planned site would make it readily accessible for drainage through the main Joseph Campau line, few problems are caused by locating it elsewhere. I find no reason why the pond could not be relocated, even though to do so would not significantly change the configuration nor save any properties in Poletown.

These five areas are the critical elements in plaintiffs' "reasonable" alternatives. Individually, the alternatives are unworkable and environmentally unsound. As units, they pose a variety of problems. For exam-

ple, location of the power plant in the northwest quadrant not only increases adverse effects from pollution, but makes the rail operations and marshalling yard use impossible. The parking and traffic hazards are present in all the alternative plans as is the inconvenience of the haulaway yard.

■ Thus, I find that none of plaintiffs' plans are reasonable or feasible. It is elemental jurisprudence that when plaintiffs filed their complaint and sought a trial in this court, they were required to prove the essential allegations in their complaint by a preponderance of the evidence. Plaintiffs are required to establish that the environmental impact statement is inadequate and that the alternatives they propose are reasonable and feasible. This is more than a required *prima facie* showing. *Sierra Club v. Froehlke*, 392 F.Supp. 130 (E.D.Mo.1975), aff'd, 534 F.2d 1289, 1300 (8th Cir. 1976); *Sierra Club v. Morton, supra*, 510 F.2d at 818; *Sierra Club v. Callaway*, 499 F.2d 982, 992 (5th Cir. 1974); *Environmental Defense Fund, Inc. v. Corps of Engineers, supra*, 492 F.2d at 1131. The point requires emphasis. More than a *prima facie* showing of deficiencies is necessary. The phrase "prima facie" or "prima facie evidence" has no fixed meaning. In a jury trial it means proof that merely entitles the proponent to go to the jury on the existence of the fact at issue if no opposing proof is offered. It is, moreover, an ambiguous phrase.

Plaintiffs contend that a smaller site could have been utilized. If this is true, some or most of the houses in Poletown would not have to be demolished. To prove by a preponderance of the evidence that the alternatives that plaintiffs suggest are reasonable and feasible and thus a useful smaller site, plaintiffs must show that the relocation of the power plant, the relocation of the railroad marshalling yards, the relocation of the water retention pond, the relocation of the haulaway yard, and the erection of multiple level parking garages or the construction of parking decks could be accomplished on a smaller site and that there would be a resultant workable plant.

To support these contentions, plaintiffs introduced the testimony of Architect Ridley and Dean Greimel. In substance, this testimony discussed how the plant site could be compressed through the devices of relocation earlier stated. But critically, these witnesses, because of their lack of expertise and because no critical analysis had been done, could not say that what they proposed would permit the plant to function and to be workable. Their testimony failed to persuade me that the proposed alternatives were reasonable and feasible because they gave me no facts on which I could conclude that, if these alternatives or a combination of them were adopted, the plant could function. While the proposals would have required large, additional monetary expenditures (the building of either a trestle or a tunnel over 1,000 feet in length to the power plant; the building of parking decks or parking garages instead of parking lots), setting this factor of cost aside which itself might make the proposals unreasonable, I base my decision in part on the failure to prove that a power plant moved away from the main plant more than 1,000 feet would be fit for the purpose intended or that railroad marshalling yards and railroad operations could be altered without any probative evidence introduced as to the feasibility of track curvatures or train makeup or breakdown. In short, feasibility was not proven.

To me it is important in deciding Count I on the merits that plaintiffs should have proved two basic contentions: (1) that the environmental impact statement was not adequate, that is to say, it did not conform to the requirements of the law; and (2) that the alternatives that the environmental impact statement should have considered were themselves reasonable and feasible. As to these points, plaintiffs' proof simply failed. I was unable to credit the testimony of the experts plaintiffs offered to establish the reasonableness and feasibility of the alternatives offered by plaintiffs.

Plaintiffs perhaps misperceive the nature of their obligation when they seek an adjudication that an agency's determination as

reflected in an environmental impact statement is faulty. Just as the decision maker in the evaluation of the impact on the environment must be provided with suitable information, so a judge in a court of law must be presented with proof which can be credited and from which findings can be made. Plaintiffs have not met this burden.

## II.

The second and third counts of plaintiffs' complaint are interrelated. Count II questions HUD's approval of a federal loan guarantee of $60.5 million prior to the preparation of an environmental impact statement. It is alleged that the approval of the loan and HUD's grant of authority to draw on the funds violated 42 U.S.C. § 4332(2)(C) because that section requires preparation of an EIS on proposals for federal action. Implicit in the word "proposal" is the notion that action has not yet been taken. Count III challenges HUD's authority to fully delegate its NEPA responsibilities to the grant applicant, Detroit, and criticizes HUD's failure to review the EIS independently in the award of Section 108 loan guarantees and Urban Development Action Grants.

An examination of the facts determines the following sequence of events. Detroit submitted its 1980–1981 Community Development Block Grant ("CDBG") application on April 16, 1980 and it was approved by HUD on June 27, 1980. On August 29, Detroit amended its application by requesting an advance of $60,500,000 against the CDBG for a Section 108 loan guarantee (42 U.S.C. § 5308). Included in the amendment was a narrative describing the CIP project, a repayment schedule explanation, certification of the legal authority to pledge grants, and certification and a statement regarding the availability of real property. (Sheldon Affidavit, Attachment 21). The application was approved September 30, 1980.

Prior to approval of the Section 108 application, Detroit requested the Council on Environmental Quality for guidance under 40 C.F.R. § 1506.11 because emergency circumstances made it difficult to comply with CEQ regulations. (Sheldon Affidavit, Attachment 15). Detroit suggested alternate arrangements to CEQ that would allow it to comply with NEPA. (Sheldon Affidavit, Attachment 16). On September 24, 1980, CEQ concurred with Detroit's proposed alternate arrangements under 40 C.F.R. § 1506.11. (Sheldon Affidavit, Attachment 17). Within the text of that letter, CEQ acknowledged an understanding that the CIP project could not go forward unless federal financial assistance was committed by October 1, 1980.

Detroit requested the release of the funds for the Section 108 loan guarantee of $60,500,000 on October 16, 1980. The request was approved October 31, 1980.

I will address plaintiffs' allegations in reverse order since it is clear that if HUD lacks the authority to delegate its NEPA responsibilities to Detroit and Hamtramck, its failure to prepare an EIS prior to the release of the funds would violate the procedural provisions of 42 U.S.C. § 4332(2)(C).

The National Environmental Policy Act of 1969 is not limited to Sections 4331 and 4332. Those sections set forth the policy and procedures of the Act, but those provisions must be read with Section 4334, which states:

> Nothing in section 4332 or 4333 of this title shall in any way affect the specific statutory obligations of any Federal agency (1) to comply with criteria or standards of environmental quality, (2) to coordinate or consult with any other Federal or State agency, or (3) to act, or refrain from acting contingent upon the recommendations or certification of any other Federal or State agency.

42 U.S.C. § 4334.

The content and context of NEPA was reviewed soon after it was enacted in *Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Commission, supra,* 449 F.2d at 1115. The court in that case stated that the requirements of Section 102 were not inherently flexible and "must be complied with to the fullest extent, unless there is a clear conflict of statutory authority." The court footnoted its statement, observing:

Section 104 of NEPA provides that the Act does not eliminate any duties already imposed by other "specific statutory obligations." Only when such specific obligations conflict with NEPA do agencies have a right under § 104 and the "fullest extent possible" language to dilute their compliance with the full letter and spirit of the Act.

449 F.2d at 1115, note 12.

In 1974, Congress adopted the Housing and Community Development Act ("HCDA"), 42 U.S.C. § 5301 *et seq.*, of which the Community Development Block Grants were a part (42 U.S.C. § 5304). That statute provides in part:

[T]he Secretary, in lieu of the environmental protection procedures otherwise applicable, may under regulations provide for the release of funds for particular projects to applicants who assume all of the responsibilities for environmental review, decisionmaking, and action pursuant to such [National Environmental Policy] Act ... that would apply to the Secretary were he to undertake such projects as Federal projects.

42 U.S.C. § 5304(h)(1). The statute then proceeds to describe the method of certification by which an applicant must specify that it has fully carried out its NEPA responsibilities, 42 U.S.C. § 5304(h)(3)(C), and that it will consent to assume the status of a responsible federal official under NEPA, 42 U.S.C. § 5304(h)(3)(D).

It is clear from this language that Congress intended to delegate the responsibility for the carrying out of NEPA responsibilities to the grant applicant. Part of the reason for the delegation derives from the fact that the Block Grants program allows a community to decide how and where the federal money will be spent. The purpose of this was to prevent "second-guessing" from Washington. S.Rep. No. 93–693, 93d Cong.2d Sess. (1974), *reported in* [1974] United States Code Cong. and Admin.News 4273, 4323–4325. Another reason, however, appears to be that HUD never "caught on" to NEPA and "never devoted resources to environmental reviews that other agencies

devoted." *See* 5 Envir.Rep., Current Develops. 1199 (1974). Therefore, CEQ was instrumental in Congress' decision to delegate the authority to the applicant. 7 Envir. Rep., Monograph 23, 1, 11 (1976). Its reasons were not to frustrate the policies articulated in NEPA, but to ensure that they indeed were executed.

Plaintiffs' concerns about the propriety of HUD's delegation have been voiced by others. [1974] United States Code Cong. and Admin.News 4273, 4325. During the comment period for the HUD regulations, the Connecticut Urban Renewal Association and the National Association of Housing and Redevelopment Officials expressed concern that implementation of Section 5304(h) of the Act would contravene the Congressional intent expressed in NEPA. 5 Envir. Rep. 1199, 1200 (1974). However, the regulations were formulated under CEQ's guidance as required by the Act, 42 U.S.C. § 5304(h)(1), to ensure that environmental concerns would be reviewed by the applicant in the decision to allocate funds for a particular project. Had it been the concern of Congress that the policies of NEPA would not be executed, it could have provided another method by which environmental review could take place.

The court in *Ulster County Community Action Committee, Inc. v. Koenig*, 402 F.Supp. 986 (S.D.N.Y.1975), disposed of a contention similar to plaintiffs' in a footnote. In *Ulster County*, 42 U.S.C. § 5304(h)(1) was reviewed to determine if an EIS was necessary when an application for Block Grants funds was submitted. It distinguished the requirements of Section 5304(h) from those at issue in *Greene County Planning Board v. Federal Power Commission, supra*, wherein a federal agency abdicated its NEPA responsibilities. The court stated, "Congress specifically authorized the Secretary of HUD to promulgate regulations to replace NEPA's environmental review requirements which would otherwise be applicable. The court, therefore, rejects this contention." 402 F.Supp. at 991, note 14.

Similarly, the court in *Monarch Chemical Works, Inc. v. Exon*, 466 F.Supp. 639 (D.Neb.1979), recognized that the broad delegation of NEPA powers under § 5304(h)(1) had been criticized because it gave local authorities responsibilities without acknowledging their possible lack of expertise and unsophisticated legal assistance. However, the court went on to note that:

> [I]t seems clear that any local deficiencies in environmental compliance are not remedied by HUD participation or review. In contrast with the 1975 amendment to the National Policy Act [sic] itself, found at 42 U.S.C.A. § 4332(2)(D) 1977, HUD has the power to delegate environmental duties to any applicant for Community Development Act funds while relinquishing all responsibility for the consequences. Nor is HUD required to involve itself in the preparation of the impact statement. 42 U.S.C.A. § 5304(h)(1) (1977).

466 F.Supp. at 646.

An analogous challenge to HUD's delegation of its NEPA responsibility was made in *National Center for Preservation Law v. Landrieu, supra*. Plaintiffs sought to enjoin the release of federal grant money to the City of Charleston because there was improper delegation of responsibilities under NEPA from the Secretary of HUD to the city as a UDAG applicant. Plaintiff in that case conceded that NEPA delegation was proper under the Community Development Block Grants program but contended that it was not applicable to UDAG applicants. The court reviewed plaintiffs' argument that because the 1977 amendments to the HCDA amended § 5304(a) to include UDAG grants but did not similarly amend § 5304(h), the latter was not meant to include UDAG money. Commented the court:

> A careful reading of the delegation provision reveals that such an amendment was unnecessary because of the language of the provision which reads "expenditures of funds under this title." The most logical interpretation of this phrase is that it was intended to make the delegation provision applicable to both CDBG grants, which were in existence at the time of the implementation of the Act, plus any future funding that might come under the HCDA, such as the UDAG grants.

496 F.Supp. at 730.

■ I agree. Congress decided that a shift in responsibility from the national level to the local level would result in more appropriate allocations of funds and it took steps to ensure that local governments had the opportunity to act responsibly when they received Block Grants money. A part of this delegation included duties under NEPA that normally would be borne by the head of the federal agency. The assumption of these responsibilities is not automatic or trivial. A city must certify that it will assume "all of the responsibilities for environmental review, decisionmaking, and action", 42 U.S.C. § 5304(h)(1), and further, accepts the jurisdiction of the federal courts for the purpose of enforcement of those responsibilities, 42 U.S.C. § 5304(h)(3)(D)(ii). If it does not, the Secretary of HUD may not release the funds. Clearly, the delegation of environmental responsibilities is a matter that Congress considered carefully and provided for with appropriate safeguards to execute the mandate of NEPA.

Plaintiffs note that Section 108 loan guarantees differ from CDBGs because they are discretionary and are not a portion of the money allocated to cities for use in community development projects that are planned by the city. Therefore, they argue, the provisions of § 5304(h) do not apply. I cannot agree. The language of that provision clearly covers "the expenditure of funds under this chapter." Chapter 69, Community Development, 42 U.S.C. § 5301 *et seq.*, encompasses not only Block Grants but also Section 108 loan guarantees and Urban Development Action Grants. Nowhere does Congress indicate that an alternative procedure from that described in § 5304(h) should be followed for UDAGs and Section 108 loan guarantees and I cannot so hold.

■ Plaintiffs have contended that the Secretary of HUD is required to indepen-

dently review the environmental impact statements submitted by the communities under § 5304(h) when he decides to award or deny funds, or he is required to prepare an independent EIS pertaining to those awards. Neither requirement is necessary. In *Colony Federal Savings & Loan Association v. Harris*, 482 F.Supp. 296 (W.D.Pa. 1980), the court concluded: ·

> To summarize: we hold that neither HUD nor its Secretary had a legal obligation under NEPA to prepare a separate environmental impact statement; nor did they have a duty to critically evaluate the *substance* of the environmental analysis prepared by the County as a grant applicant under the HCDA. However, the federal defendants did have a duty under the HCDA, 42 U.S.C. & 5304(c)(3), and the APA, 5 U.S.C. & 706(2)(B), (C), to review the grant applicant to see that *procedural* requirements were met and that applicable federal regulations were followed.

482 F.Supp. at 304. *See also, Monarch Chemical Works, Inc. v. Exon, supra.* The court determined that § 5304(h) transfers NEPA duties from the federal agency to the grant applicant and that HUD is only responsible for ensuring that the applicant procedurally complies with NEPA.[3]

The reasoning was cited with approval by the court in *National Center for Preservation Law, supra* 496 F.Supp. at 731. Applying the reasoning of *Colony Federal, supra,* the court held:

Therefore, the scheme of this statutory provision [42 U.S.C. § 5304(h)] allows an applicant to assume the responsibilities of the Secretary of HUD for the purposes of preparing an EIS, conducting all relevant studies, considering all reasonable alternatives, and in general preparing an EIS which adequately discusses the environmental effects and alternatives of the proposed project. Furthermore, once the applicant certifies that it has, in fact, carried out all of the necessary responsibilities in compliance with NEPA, the Secretary of HUD is also deemed to have satisfied all of his responsibilities under that Act. Accordingly, the actual review by HUD is limited to a determination that the applicant has followed all of the procedural requirements of the CEQ guidelines and the regulations found at 24 C.F.R. Part 58, in conducting its environmental review. *See* 42 U.S.C. § 5304(c)(3); 5 U.S.C. § 706(2)(B), (C). 496 F.Supp. at 731. I concur in these interpretations of the statute.

█ Plaintiffs have asked me to consider correspondence attached as Exhibits C–F to Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction between CEQ and HUD in my decision of the extent of HUD's NEPA responsibilities in UDAG applications. I have read these letters and it is my conclusion that the dispute centers about the regulations that HUD has promulgated to implement § 5304(h). CEQ interprets that section to exclude UDAG applicants; HUD interprets it to include all Title I

---

**3.** Plaintiffs challenged the adequacy of the environmental impact statement in Count I of their complaint. Although they did not raise the issue, it could be argued that the failure to include all reasonable alternatives in the EIS constituted a procedural violation of NEPA, thus subjecting the Secretary of HUD to liability because of his continuing responsibilities to enforce NEPA procedures. I believe that this claim would fail, however, on two grounds. First, during the scoping process, HUD requested incorporation of several items in the EIS, including justification of spending public funds on private industry, employment analyses, and the impact of relocation on Poletown residents. (Sheldon Affidavit, Attachment 7). Similarly, HUD recommended investigation of rooftop or

structured parking to provide for the use of a smaller site. (Testimony of Nancy Sheldon, April 9, 1981, morning session). HUD also offered comments on the scoping document and the draft EIS. (Sheldon Affidavit, Attachments 20, 38). These actions indicate that HUD was monitoring the environmental review process at all stages. Second, § 5304(h)(3)(D) requires the fund recipient to assume all responsibility for "environmental review" under § 5304(h)(1). This would appear to indicate that, although the Secretary of HUD retains responsibility for the procedural requirements, questions as to the *adequacy* of the procedures are beyond his duty, and are more properly, within the domain of the fund recipient.

funds. For the reasons expressed above, I agree that UDAG applications are within the purview of § 5304(h). Although CEQ is the agency charged with the enforcement of NEPA, HUD is required to interpret the HCDA and its interpretations should be deferred to unless they are arbitrary, capricious, or an abuse of discretion. *Vermont Yankee Nuclear Power Corp. v. NRDC, supra; Coalition for Responsible Regional Development v. Coleman,* 555 F.2d 398, 399 (4th Cir. 1977); *E. I. duPont de Nemours v. Train,* 541 F.2d 1018, 1026 (4th Cir. 1976).

I do not find that HUD's interpretation is outside this standard of judicial review since the language of the statute specifically states that it is applicable to all funds disbursed under Title I. In light of the history of the statute and the regulations, CEQ has participated in the formulation of the procedures and I have no reason to believe that they are anything other than sufficient to meet the mandate of NEPA. Until CEQ and HUD agree to issue new regulations, I am bound to apply the current rules and not interject the court into an interagency dispute.

### III.

I turn now to plaintiffs' second claim which alleged a violation of 42 U.S.C. § 4332(2)(C) because HUD approved the Section 108 loans to Detroit and the UDAG grants to Hamtramck prior to the preparation of a final EIS. To substantiate their contention, plaintiffs argue that CEQ cannot effectively provide emergency provisions that would permit the federal action to begin prior to the time an EIS has been prepared because § 4332(2)(C) requires an EIS to be prepared in "every recommendation or report on *proposals* for legislation and other major Federal actions significantly affecting the quality of the human environment" (emphasis added). Therefore, it is plaintiffs' position that although CEQ authorized an environmental analysis on an accelerated schedule, it did not have the authority to waive the requirement of the preparation of the EIS prior to the federal action and that HUD acted improperly by

releasing the Section 108 loan guarantee before the final EIS was prepared.

I have previously concluded that the Secretary of HUD can properly delegate the responsibility for NEPA compliance to the grant applicant and it may release the funds that have been approved upon certification of such compliance by the chief executive officer of the applicant. Thus, to determine if HUD violated NEPA by the release of the funds, it is necessary to determine if Detroit fulfilled its NEPA responsibilities. Since Detroit operated pursuant to CEQ's guidance, I must first determine the extent of CEQ's authority to interpret NEPA. A review of the pertinent facts will assist in this analysis.

At the time that Detroit was contemplating the CIP project, it held a series of public meetings. Some of these were to meet the requirements of 42 U.S.C. § 5304(a)(6) and § 5318(c)(5) because HUD funding was anticipated from CDBGs and UDAGs as well as from Section 108 loans. The first meetings were held on August 4 and 5, 1980, to consider a proposed amendment to Detroit's 1980–1981 Community Development Block Grant application. (Sheldon Affidavit, Attachment 4). The hearings explained the CIP project and allowed for citizen participation. Minutes of the meeting included the comments of citizens and Detroit's responses. (Sheldon Affidavit, Attachment 5). Concurrently, Detroit was proceeding with the preparation of an EIS because of the "large-scale nature of the project in a dense urban setting, and the magnitude of relocation and related social and economic consequences associated with a project of this nature and scale." (Sheldon Affidavit, Attachments 1, 3; 45 Fed.Reg. 49361 (July 24, 1980)). Scoping meetings were held with the Environmental Protection Agency on August 1, 1980 and with HUD on August 5, 1980. (Defendants' Exhibit 13; Sheldon Affidavit, Attachment 7). A public hearing was held on August 14, 1980 from 10:00 a. m. to 9:00 p. m. (Sheldon Affidavit, Attachment 8). The scoping document that identified particular issues that needed to be addressed in the

EIS was prepared on August 29, 1980. (Sheldon Affidavit, Attachment 12).

After a number of conversations with HUD concerning the expediency with which the project must go forward, Detroit, as an applicant who assumed responsibility for environmental protection procedures pursuant to § 5304(h) and 40 C.F.R. Part 58, requested alternative arrangements pursuant to CEQ's emergency provisions, 40 C.F.R. § 1506.11. (Affidavits of Don Patch, Richard H. Brown; Sheldon Affidavit, Attachment 15). Normally, a final EIS must be completed before certification of a community's compliance with NEPA can be made to HUD and the funds can be released. 24 C.F.R. § 58.17(f)(5). However, based on the statements of Detroit in its request for emergency procedures and its proposed schedule for compliance with NEPA, CEQ approved Detroit's request for alternate arrangements on September 24, 1980. (Sheldon Affidavit, Attachments 16, 17). Detroit then applied to HUD for the release of funds, certifying *not* that it complied with the normal NEPA procedures as required by HUD, 24 C.F.R. Part 58, but rather, that it complied with special procedures under the emergency arrangements confirmed by CEQ. HUD approved the release on October 31, 1980.[4]

A second amendment to the Block Grant application was submitted on November 24, 1980, and approved January 2, 1981. Since the amendment was for the CIP project, the draft EIS had been distributed at the time of the application and the final EIS was completed at the time of the Section 108 approval. Therefore, Detroit clearly met the requirements of HUD and CEQ for environmental review on the second loan guarantee application and no further comments need be addressed to this issue.

The principal contention of plaintiffs concerns the first Section 108 loan guarantee. Plaintiffs do not argue that CEQ has the authority to modify or waive its own regulations. Instead, they contend that CEQ's acquiescence in Detroit's plans could only apply to their own regulations and not to the statutory requirements of NEPA. Therefore, it is plaintiffs' position that defendants had to prepare an impact statement prior to the approval of the loan and release of the funds to comply with the mandate of 42 U.S.C. § 4332(2)(C) in spite of CEQ's approval of alternate arrangements.

I do not agree. The Council on Environmental Quality was created by the National Environmental Policy Act of 1969 in Subchapter II, 42 U.S.C. § 4341 *et seq.* The duties of the Council, as set forth in the statute, are principally advisory in nature, concerning the changes and impacts wrought upon the environment. The most active statutory role the Council has is to recommend changes in agency programs and activities to the President that would further the goals articulated in Subchapter I, 42 U.S.C. § 4331 *et seq.* The President, however, has a constitutional duty to ensure that the laws are faithfully executed. United States Constitution, Article II, Section 3. The duty to enforce NEPA may be delegated by the President pursuant to the Presidential Subdelegation Act, 3 U.S.C. § 301 *et seq.*, since it is not affirmatively prohibited by statute, nor is the delegation restricted to a person who has been appointed by the President with the advice and consent of the Senate. In Executive Order 11991, President Carter delegated the responsibility for NEPA enforcement to CEQ:

[The Council on Environmental Quality shall:]

. . . .

(h) Issue regulations to Federal agencies for the implementation of the procedural provisions of the Act (42 U.S.C. 4332(2)). . . . They will be designed to make the environmental impact statement process more useful to decisionmakers and the public; and to reduce paper-

---

4. No question has been raised regarding HUD's authority to waive its own regulations. An argument could be made that HUD could not waive Part 58 because of CEQ's participation in the formulation of those regulations. However, such a contention would fail for obvious reasons.

work and the accumulation of extraneous background data, in order to emphasize the need to focus on real environmental issues and alternatives. . . . The Council shall include in its regulations procedures (1) for the early preparation of environmental impact statements, and (2) for the referral to the Council of conflicts between agencies concerning the implementation of the National Environmental Policy Act of 1969, as amended.

Exec. Order 11991, amending Exec. Order No. 11514, § 3(h), *supra.* The Order clearly indicates that CEQ has the responsibility for interpretation of the procedural portions of NEPA. *See, Andrus v. Sierra Club, supra.*

CEQ has promulgated extensive regulations to ensure compliance with NEPA. 40 C.F.R. Parts 1500–1508. Like plaintiffs, CEQ has defined "proposal" as:

That state in the development of an action when an agency subject to the Act has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated.

40 C.F.R. § 1508.23. The definition continues, advising that preparation of an EIS should be timed so as to be incorporated with a recommendation or report on the proposed action. Timing, as defined in § 1502.5, varies with the purpose of the impact statement. For projects that agencies undertake directly, the EIS should be prepared at the "feasibility analysis ('go-no go') stage." The delegation provisions in 42 U.S.C. § 5304(h) indicate that Detroit should have prepared the EIS at this stage. However, CEQ regulations provide for arrangements to be made by the Council and the federal agency when emergency circumstances make it necessary to act without observing the CEQ provisions. 40 C.F.R. § 1506.11.

[11] CEQ has been delegated the responsibility to implement the procedural requirements of NEPA. Its interpretation of NEPA is entitled to substantial deference.

*Andrus v. Sierra Club, supra* 442 U.S. at 358, 99 S.Ct. at 2341; *Warm Springs Dam Task Force v. Gribble, supra* 417 U.S. at 1309–1310, 94 S.Ct. at 2546–2547.

The Council was created by NEPA, and charged in that statute with the responsibility "to review and appraise the various programs and activities of the Federal Government in light of the policy set forth in . . . this Act . . . and to make recommendations to the President with respect thereto." 42 U.S.C. § 4344(3).

442 U.S. at 358. CEQ interpreted NEPA through the promulgation of its regulations. It recognized the possibility that circumstances could arise that would make it impossible to comply with the rigorous obligations of NEPA. Therefore, CEQ provided for an emergency provision, 40 C.F.R. § 1506.11. The proposed rule was even more restrictive than the final rule and CEQ, in response to comments on the rule, altered the wording to allow agencies to take action first and consult with the Council as soon as feasible, not necessarily before the emergency action took place. 43 Fed. Reg. 55978, 55988 (November 29, 1978).

■ It is immediately apparent that CEQ not only had the authority to waive its own regulations for Detroit, but also to interpret the provisions of NEPA to accommodate emergency circumstances. There is no suggestion that Detroit misrepresented the gravity of the situation. Plaintiffs have intimated that CEQ permitted the emergency procedures solely because the site needed to be cleared by May 1, 1981 and the elderly relocated before winter. Although these are some of the reasons articulated in CEQ's letter of concurrence (Sheldon Affidavit, Attachment 17), there were other factors involved that were presented by Detroit. These included unemployment, crime, a decreasing tax base, and a decrease in bond rating to below investment grade. The necessity of federal funds to complete the CIP project has never been questioned and it was the need to have a commitment from HUD, and not the relo-

cation of persons before the onset of winter, that prompted the request.[5]

Detroit, therefore, was properly permitted to make alternate arrangements for environmental review outside the normal NEPA procedures. Since Detroit complied with CEQ regulations and made the alternate arrangements, its NEPA responsibilities and, derivatively, HUD's NEPA responsibilities were fulfilled. As I previously noted, HUD regulations do not normally permit the release of Title I funds until the completion of a final EIS. However, HUD has the authority to permit exceptions to its regulations. The release of the Section 108 loan guarantee thus was proper before the preparation of a final EIS in this instance.

Plaintiffs also claim that the UDAG funds, for which Hamtramck applied, were improperly approved and released. This is simply not the case. Hamtramck submitted a UDAG application pursuant to 42 U.S.C. § 5318 on November 29, 1980. This application was for federal funds to assist in the development of the portion of the CIP that would be located in Hamtramck. (Defendants' Exhibits 1–4). Conditional approval was made on February 12, 1981, for $30 million. However, Hamtramck has not applied for the release of this money. Until it does so, it need not make the certification of compliance with the environmental review procedures to HUD. Since the environmental review was undertaken jointly by Detroit and Hamtramck, and a final EIS was issued on December 22, 1980, I see no evidence that the certification cannot be made at this time. Similarly, I find that Hamtramck has completed its environmental review responsibilities for the CIP in that portion of the UDAG application submitted to HUD in February of this year. (Plaintiffs' Exhibit 12). I do not have sufficient evidence before me to determine that the remainder of the project for which funding was requested has been environmentally reviewed. This issue is not before me and I decline to render a determination of it on these facts.

## CONCLUSION

This case was brought here because of a concern for the environment. Plaintiffs and defendants both relate their concerns to pronouncements in the statutes and regulations, i. e.: 42 U.S.C. § 4331(a), which recognizes the profound impact of man's activity on the interrelations of all components of the natural environment, "[I]t is the continuing policy ... to use all practical means and measures ... to foster and promote the general welfare to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic and other requirements of present and future generations of Americans."; 42 U.S.C. § 4331(b), which says in

5. It should be noted that plaintiffs argue that Detroit misrepresented the need to turn over the site to GM by May 1, 1981, and have based their argument on the fact that approximately 500 homes are presently occupied in Poletown. (See Testimony of Richard Hodas, April 7, 1981, morning session). The letter of agreement between Detroit and GM provides for title to the site and railroad marshalling yards to be vested in Detroit by May 1, 1981. (Sheldon Affidavit, Attachment 26, p. 4). Marketable title was to be conveyed on a phased basis. For Detroit to acquire title, it had to comply with the Michigan Quick Take Act, M.C.L.A. 213.51 et seq. That Act provides in part:

At the time the complaint is filed, the agency shall deposit the amount estimated to be just compensation with a bank, trust company, or title company in the business of handling real estate escrows, or with the state treasurer, municipal treasurer, or county treasurer. The deposit shall be set aside and held for the benefit of the owners, to be disbursed upon order of the court as provided in section 8. M.C.L.A. 213.55. Therefore, before Detroit could begin acquisition of approximately 1675 parcels, it needed to have money available to deposit in escrow. Detroit's fiscal crisis precluded it from depositing any amount of money from its own revenues. Therefore, federal assistance was required to proceed with the project and meet the contractual arrangements. I additionally note that the unconscionability of the contract is not in question. Detroit has been in an economic crisis for several years. It was given the opportunity to rehabilitate its tax base and employ approximately 6,000 people. I do not question the judgment of the Detroit officials to act in a rapid manner to alleviate the present fiscal situation of the City. I will not do so in an indirect manner by interpreting the application to CEQ pursuant to § 1506.11 as plaintiffs desire.

part, "To use all practicable means ... to the end that the nation may ... (5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities."; and regulations of the Council on Environmental Quality, 40 C.F.R. 1508.14, which define the human environment as follows: "It ... shall be interpreted comprehensively to include the natural and physical environment." Continuing, "This means that economic or social effects are not intended by themselves to require preparation of an environmental impact statement. When an environmental impact statement is prepared, and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment."

It has long been noted that the environmental problems of a city are not simply reduced to clean air and clean water. *First National Bank of Chicago v. Richardson*, 484 F.2d 1369 (7th Cir. 1973); *Nucleus of Chicago Homeowners Association v. Lynn*, 524 F.2d 225 (1975). Instead, a variety of factors must be considered when one examines the "environmental impact" of construction in the city.

The Council for Environmental Quality first identified this distinction in its second annual report to the President:

> The traditional environmental objectives of clean air and water and preservation of national parks and wilderness are not the central concerns of most inner city poor. They focus instead on more immediate economic and social interests. Some spokesmen for inner city areas fear that the environmental movement may divert public attention and funds from these issues to more traditional environmental issues. For many inner city residents, the overwhelming concern is poverty and its accompanying ills—inadequate housing, high crime rates, poor health, unsanitary conditions, inadequate education and recreation, and drug addiction—all of which are exacerbated by racial discrimination. These factors may

not be environmental when looked at individually. But their net effect is to lower the quality of life.

> Nevertheless, there is growing evidence, that among the urban poor—those with the most to gain from environmental improvements—are some who have decided to embrace environmentalism in their own distinct way. Their use of the term environment is broader than the traditional definition. Their concept embraces not only more parks, but better housing; not only cleaner air and water, but rat extermination.

> ....

> The variety of environmental problems of the inner city and the absence of simple answers to these problems make it particularly important that efforts to overcome them be tailored to the needs and priorities of each locality.... A solution to these problems requires, first of all, that the significant local resources be used in a planned, effective way to meet locally determined priorities. Federal aid can be most effective when it helps the locality to meet its own recognized needs rather than impeding or distorting local priorities.

2 CEQ Annual Report 189–207 (August 1971).

Plaintiffs say that their environment is threatened, and they relate this concern to a way of life and the use of property in a small area known as Poletown near the geographic center of Detroit. They say that the demolition of the buildings there, residential, commercial and institutional, will terminate a social and cultural environment, and that these consequences are so adverse to that environment that the process of demolition should be halted, that the project known as the Central Industrial Park enveloping this area should be reconsidered, and that hopefully a smaller site will be utilized for the GM plant. Plaintiffs do not seriously challenge the EIS for its conclusions regarding the environment as it is traditionally defined.

Defendants also demonstrate a concern for the environment. They say that envi-

ronment is a much larger area within both Detroit and Hamtramck. They too define that threatened environment as a way of life and the use of property. They contend that unless Detroit and Hamtramck can transfuse this inner city area through the building and operation of a large industrial automobile plant by General Motors which will provide much needed employment, not only is the natural and physical environment known as Poletown doomed, but incalculable harm through unemployment, increased criminal conduct and their sequelae of despair will terminate whatever significant social and cultural life remains in that area.

While the expressed concerns of the parties are similar, their goals are not. Plaintiffs seek a solution which will preserve the buildings in Poletown, and they hope from such preservation that some new vitality may be sparked in the area. This goal is difficult of attainment since most of the property in this area has now been acquired by Detroit through condemnation procedures, and it is highly unlikely that these former owners or residents will either desire to buy back their properties or move back into the area. The reality that plaintiffs face is that many of their former neighbors, for whatever reasons, including the effect of the announcement of the purchase of the Poletown area through condemnation by Detroit, may no longer have any interest in the area. Plaintiffs in seeking their goal must face the additional reality that the area in which they live is part of a large aging area in the inner city and that the transitional changes which are affecting such large urban areas and which are, in part, caused by the closing and relocation of industrial plants and by movement of white people from the area have also affected Poletown. Indeed, the phasing out by Chrysler Corporation of their manufacturing activities, culminating with the closing of the Dodge Main plant, may have accelerated the process.

Defendants' goal is to seek to revive the area by building a large, new industrial plant. Defendants claim that the resulting employment is absolutely essential for the

natural and physical environment, and particularly for the general welfare of the people of Detroit and Hamtramck, and that these considerations outweigh the adverse consequences of the demolition of the buildings in the Poletown area.

Plaintiffs insist that the environmental impact statement must be returned to the agency which prepared it so that another hard look may be taken as to the consequences to the environment. While it is not within my power to make the decision as to what the goal should be, I do believe, since an appeal has been made to the equitable powers of this court by plaintiffs, that I should apply equitable considerations in my decision. *See, Realty Income Trust v. Eckerd,* 564 F.2d 447 (D.C.Cir.1977). *See also, Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission, supra,* 449 F.2d at 1113: " 'Environment amenities' will often be in conflict with 'economic and technical considerations'. To 'consider' the former 'along with' the latter must involve a balancing process. In some instances environmental costs may outweigh economic and technical benefits and in other instances they may not. But NEPA mandates a rather finely tuned and 'systematic' balancing analysis in each instance."

What I mean by these observations and case references is this: Even though, as a judge, I would not be taking the hard look, for I would, should such action be warranted, by remanding it to the agency for that purpose, nonetheless I wonder what, faced with this systematic balancing analysis, the agency would face, and having for many days now heard proof, which I have found to be wanting, whether any agency faced with these same alternatives could do anything but to reaffirm its prior decision.

It is now clear to me that all the acreage in the proposed Central Industrial Park is needed for this new plant. It is clear to me that there is no reasonable and feasible solution that would permit the building of the plant on a smaller site such as plaintiffs proposed. I have found both that the envi-

ronmental impact statement is adequate and that it fully complies with requirements of law, and that the alternatives which plaintiffs contend would permit a smaller site (and thus save Poletown) are each, either viewed separately or taken together, not feasible or reasonable.

Nonetheless, when I view the environmental concerns in a total sense, that is to say, balancing the environmental costs, the economic benefits and the general welfare of the communities that are involved, I observe this: Unemployment in Detroit has risen from nearly 90,000 people, or 14.2 per cent of the labor force in January 1980, to nearly 106,000, or 15.8 per cent of the labor force by December 1980. At the time that Detroit made its emergency request for alternative arrangements (under 40 C.F.R. 1506.11 of the National Environmental Policy Act), families then receiving Aid to Dependent Children totaled 76,224. The emergency request states that the General Assistance Program (for single individuals under age forty-five) had increased by 200 per cent over the past twelve months (1979–80). In a current three-month period, more than 2,000 persons have been certified as malnourished or medically indigent. Crime in Detroit which had been in decline increased by 15 per cent and homicides increased by 25 per cent in the first six months of 1980. At the same time, because of budget constraints, 400 police officers and 33 firefighters were laid off. Further future layoffs are foreseen. Reflecting uncertainty in Detroit's financial situation, the bond ratings assigned to the City for the sale of its bonds by Standard and Poors went from "BBB" to "BB" and Moody's rating went from a "Baa" to "Ba".

Hamtramck as a community suffers similarly. In that city the closing of the Sherwin-Williams Company, Federal's Department Store, and the Dodge Main plant resulted in diverse impacts which could only occur from the loss of over 6,000 jobs. The closing of the Dodge Main plant meant a loss of $175,000,000 in annual payroll, and this has had an immediate impact in Hamtramck, and directly in the loss to that city of $2,300,000 in property taxes. Both Hamtramck and Detroit estimate huge budget deficits in the coming year. Informed observers point out that unless these trends are reversed, Detroit may well become bankrupt, and domino-like Hamtramck may follow.

While these factors do not directly impact on the quality of air or noise or on the physical environment in a narrow sense, they are considerations which affect the natural and physical environment and the relationship of people within that environment. 40 C.F.R. 1508.14.

I view also the plaintiffs' claim that the demolition of Poletown presents a problem of even greater primacy and significance. Poletown, an area bounded by St. Aubin Avenue, East Grand Boulevard, Mt. Elliott Avenue and the Ford Freeway, is physically not a large area. In it, as of August 1980 (p. IV–24 Final EIS), were 3,438 persons. This total was made up of 899 families and 463 individuals. Of the families, 480 were black and 407 were white. Some eight months later, it is difficult to know how many people still live in the area. According to an informal survey made by and testified to by Richard Hodas, a plaintiff, he found that some 500 homes still contain residents and that perhaps another 176 might be occupied. There are 1,670 lots, and before the condemnation procedures and demolition began, there were 1,340 structures in the Central Industrial Park area. Of these 1,340 structures, 1,150 are residences and 70 structures are commercial, but care must be taken with these figures since not all of Poletown extends throughout the Central Industrial Park area.

I have made a careful, personal inspection of the area. Richard Hodas pointed out in his testimony that he observed 29 residential buildings that were boarded up, 99 that are vacant, 139 that appear to be vandalized, and 22 that are burned. This appears to be a responsible observation.

I am of the opinion that this area did not begin to decay only eight months ago when Detroit and Hamtramck announced their

plans. The environmental impact statement graphically relates the changes that occurred in this area over many years, and the results depicted are not at all unusual to the changing character of the inner cities containing large industrial areas. That pattern has been identical almost everywhere. Inner city areas cannot be saved by the well-intentioned development of block clubs, neighborhood councils and the like. One wonders whether such programs, as the Model Cities Plan, can have any real effect. What is needed is what brought Poletown into being in the first instance, and that is the creation of a community in which employment is provided, in which jobs, payroll and tax revenues become the bases upon which future growth proceeds.

Viewed thus, any agency taking a hard look at the alternatives could not but conclude that even though the demolition of these residential, commercial and institutional buildings in Poletown is adverse in a human sense, that consequence is nowhere near as adverse to the environment as the loss of the plant.

## DISPOSITION

In summary, Count I of plaintiffs' complaint is dismissed and summary judgment is granted to defendants as to Counts II and III of plaintiffs' complaint; plaintiffs' motion for a preliminary injunction is denied and plaintiffs' motion for summary judgment on Counts II and III of their complaint is denied; defendant HUD's motion to dismiss Count I is moot. Summary judgment is granted on Counts II and III to all defendants. Defendant General Motors' motion to dismiss is denied.

An appropriate order may be submitted.