RESIDENTS IN PROTEST—I–35E, a Minnesota nonprofit corporation, State of Minnesota by Residents in Protest—I–35E, West Seventh/Fort Road Federation, State of Minnesota by West Seventh/Fort Road Federation, and Richard F. Coates, Gwendolyn J. Coates, Robert Kuehn, Opal Kuehn, George Picka, Blanche Picka, Charles Repke, Jr., Michele Repke, Raymond C. Wood, Diane Wood, Robin L. Howard, Patsy Tupper, Stanley S. Todora, Ann M. Todora, Karen H. Avaloz, Cindy York, Charles M. Locks, William L. Klas, Louise A. Klas, Daniel A. Klas, Mary Louise Klas, Davitt Felder, Jeanne Felder, D. Ward Johnson, Charlotte Johnson, David M. Lilly, Perrin B. Lilly, Thomond R. O'Brien, Alvina W. O'Brien, and John R. Rupp, each individually and on behalf of the State of Minnesota, Plaintiffs,

v.

Elizabeth DOLE, Secretary of the United States Department of Transportation, individually and in her official capacity, Ray Barnhart, Administrator, Federal Highway Administration, individually and in his official capacity, Richard Braun, Commissioner of the Minnesota Department of Transportation, individually and in his official capacity, the Metropolitan Council and its members, individually and in their official capacity, the City of Saint Paul, and the St. Paul City Planning Commission and its members, individually and in their official capacity, Defendants.

No. Civ. 3–83–346.

United States District Court,
D. Minnesota,
Third Division.

Feb. 10, 1984.

, Robert J. Sheran, David A. Allgeyer, Richard T. Ostlund, Lindquist & Vennum, Minneapolis, Minn., for plaintiffs.

John T. Hoeft, Staff Counsel, St. Paul, Minn., and Peter K. Beck, Minneapolis, Minn., for defendant Metropolitan Council and its Members.

William A. Caldwell, Sp. Asst. Atty. Gen., and Eric Schultz, St. Paul, Minn., for defendant Richard Braun, Com'r of the Dept. of Transp., State of Minn.

James E. Lackner, Asst. U.S. Atty., Minneapolis, Minn., for defendants Elizabeth Dole and Ray Barnhart.

Jerome J. Segal, Asst. City Atty., St. Paul, Minn., for defendants City of St. Paul, St. Paul Planning Com'n and its Members.

## MEMORANDUM ORDER

MAGNUSON, District Judge.

### I.

### INTRODUCTION

This matter is before this court upon plaintiffs' request for injunctive relief to prevent completion of a segment of I–35E along what is referred to as the Pleasant Avenue corridor. A court trial was held between January 9, 1984 and January 31, 1984. Robert J. Sheran, Esq., David A. Allgeyer, Esq., and Richard T. Ostlund, Esq., appeared for plaintiffs. William A. Caldwell, Special Assistant Attorney General, and Eric Schultz, Esq., appeared for defendants Richard Braun, Commissioner of the Department of Transportation, State of Minnesota. John T. Hoeft, Esq., and Peter K. Beck, Esq., appeared for defendant Metropolitan Council and its members. Jerome J. Segal, Assistant City Attorney, appeared for defendants City of St. Paul, St. Paul Planning Commission and its members. James E. Lackner, Assistant United States Attorney, and John Kraybill, Esq., appeared for defendants Elizabeth Dole and Ray Barnhart. Post trial briefs were submitted on February 7, 1984. Pursuant to Fed.Rule Civ.P. 52(a) this memorandum shall constitute the Findings of Fact and Conclusions of Law of this court.[1]

The plaintiffs in this action include three non-profit organizations organized under the laws of Minnesota representing neighborhood associations and residents that live near the proposed construction of Interstate 35E. The defendants in this action are the Secretary of the U.S. Department

---

1. The parties engaged in an extensive stipulation of facts which is incorporated herein by reference.

of Transportation, the Administrator of the Federal Highway Administration, the Commissioner of the Minnesota Department of Transportation, the Metropolitan Council, the City of St. Paul, and the St. Paul Planning Commission. These defendants were all involved in the preparation or approval of the environmental impact statement along the proposed Interstate 35E corridor.

Interstate 35E is a major north-south interstate which extends from Laredo, Texas to Duluth, Minnesota. When it approaches the Twin Cities, Interstate 35E divides into two routes. Interstate 35W takes a westerly route through Minneapolis, Minnesota and links up with I-35 at a point north of the Twin Cities. I-35E comes through St. Paul, Minnesota and also links up with I-35 north of the Twin Cities. With the exception of a nine mile section in Dakota County and a 3.9 mile section in Ramsey County, I-35E is substantially complete. The 3.9 mile section in Ramsey County, which runs through the western portion of downtown St. Paul, forms the basis of this lawsuit.

## II.

### PLEASANT AVENUE CORRIDOR

Pleasant Avenue is an old street located just west of the central business district of downtown St. Paul. Since 1922 the Pleasant Avenue Corridor has been the planned route for a high capacity roadway. The location of I-35E in the Pleasant Avenue Corridor was first proposed in 1955. Between 1955 and the mid-1960s, most of the right-of-way for the segment of I-35E that was planned for the Pleasant Avenue Corridor was acquired. Well over 200 homes were purchased. Construction of that segment of I-35E began in 1964 but was stopped in 1972 by a lawsuit involving some of the same plaintiffs in this action. The 1972 lawsuit was settled on the condition that the defendants would prepare an environmental impact statement before proceeding with further construction on I-35E through the Pleasant Avenue Corridor.

At the time that construction along the Pleasant Avenue Corridor was stopped in 1972, many of the bridges were already constructed and over half the grading work had been done. In all, the defendants had a financial investment in excess of Twenty Million Dollars ($20,000,000.00) on the Pleasant Avenue Corridor.

In 1975, the Minnesota Legislature enacted a statute prohibiting construction of I-35E through the Pleasant Avenue Corridor. However, the legislature did permit the Department of Transportation to construct an indirectly connected parkway along the Pleasant Avenue Corridor. In 1978, the Legislature, again by statute, directed the Metropolitan Council to prepare an environmental impact statement to assess all I-35E project alternatives.

The Metropolitan Council delegated the task of preparing an environmental impact statement to a group known as the Project Management Team (PMT). The Project Management Team consisted of representatives of the Metropolitan Council, the Minnesota Department of Transportation, and the Federal Highway Administration. In addition, they were assisted by technical support staff and a consultant who was an expert in the area of transportation and environmental matters. The PMT decided at the outset that they would prepare the environmental impact statement in three separate steps. The first step was known as the Phase I process. During the Phase I process, the PMT was to identify the range of potentially viable alternatives for I-35E that would be considered in the draft environmental impact statement. The second step, Phase II, involved preparation of the draft environmental impact statement (DEIS). The third step, Phase III, was the preparation of the final environmental impact statement (FEIS).

Much of the controversy in this litigation centers around the actions that were taken by the PMT during the Phase I process. One of the plaintiffs' main contentions is that certain actions taken by the PMT during the Phase I process preordained the outcome of the final environmental impact

statement. In examining potential alternatives during the Phase I process, the PMT identified a northern and southern point which the proposed alternative would have to connect. The southern point was located at the proposed I-35E/I-494 interchange in Dakota County. The northern point was located at the existing I-35E/I-694 interchange in Ramsey County. To connect these two points, the PMT identified seven potential corridors for I-35E. The corridors considered by the PMT were: (1) Pleasant Avenue, (2) Shepard Road, (3) Lafayette Freeway, (4) Shortline-I94, (5) Concord Avenue, (6) Trunk Highway 61, (7) I-94/694, (8) no-build option.

The PMT met on a weekly basis throughout the spring and summer of 1978 and published a draft report in July of 1978. The draft report was published in its final form in March of 1979 and was called the "Interstate 35E Study Phase I" (Phase I Report).

The crucial event that took place during the Phase I Report was that the PMT not only identified, but ranked, the seven corridors plus the no-build option. The corridors that received the highest ranking were Pleasant Avenue and Shepard Road. Those were the only two corridors that were subject to detailed environmental analysis in the Phase II and Phase III processes. It is the plaintiffs' contention in this case that the elimination of the other six alternatives prior to preparation of the draft environmental impact statement constitutes a violation of the National Environmental Policy Act. Following the publication of the Phase I Report, work on the DEIS began. It continued until its publication in June of 1981. Following completion of the DEIS, the St. Paul Planning Commission, the City Council of St. Paul, and the Metropolitan Council expressed their support for a directly connected parkway in the Pleasant Avenue Corridor. In December of 1981, the Commissioner of the Minnesota Department of Transportation, Mr. Richard Braun, approved the Pleasant Avenue Corridor as the preferred alternative and directed that the Final Environmental Impact Statement be prepared. The Final

Environmental Impact Statement was completed in October of 1982. That same year, the Minnesota Legislature repealed the prohibition against the directly connected parkway in the Pleasant Avenue Corridor.

The Final Environmental Impact Statement was distributed in November of 1982 for public and agency comment. The City of St. Paul in November of 1982 indicated its agreement with the Final Environmental Impact Statement. On December 16, 1982, the Minnesota Environmental Quality Board determined that the Environmental Impact Statement was adequate. In December of 1982, the Federal Highway Administration and the Metropolitan Council approved the project. On April 28, 1983, the Minnesota Pollution Control Agency approved the indirect source permits required for I-35E.

This action was commenced on March 21, 1983. Following a hearing on the plaintiffs' motion for a preliminary injunction in May of 1983, a stipulation was agreed to by all parties in this action permitting the defendants to go ahead with construction of I-35E from West Seventh Street to St. Clair Avenue, pending the resolution of this lawsuit. The defendants agreed that such construction would be done at their own risk and without prejudice to the plaintiffs' case.

### III.

### PHASE I

The PMT started the Phase I process by identifying a northern and southern termini which any proposed corridor would have to connect. The northern terminus was the existing interchange between I-35E/I-694 in Ramsey County. The southern terminus was located at the proposed I-35E/I-494 interchange in Dakota County. They then identified seven potential corridors plus a no-build option. The PMT then established a set of criteria by which to measure the viability of the seven corridors. These criteria were taken primarily from the Metropolitan Council's Regional Transportation

Policy Plan. The evaluation of the seven corridors assumed that the proposed link up would be built to full interstate design standards with a direct connection to the area's interstate system.

After they identified the criteria, the PMT assigned a point range of 1 to 5 for each criterion. If a corridor received a perfect score as weighted against a particular criterion, it received a numerical score of 5. A full chart with the results of the process is reproduced as Appendix A.[2]

Based upon the results of the first level evaluation, the PMT decided that only two corridors, Pleasant Avenue and Shepard Road, needed further detailed consideration. The plaintiffs presented very little evidence to demonstrate that the exclusion of the Short Line/I–94, Concord, TH 61, or I–494/694 corridors was improper. The thrust of the plaintiffs' argument, and evidence at trial, is that the exclusion of the Lafayette corridor by the PMT violated the National Environmental Policy Act (NEPA).

■■■ The National Environmental Policy Act (NEPA) 42 U.S.C. § 4332 *et seq.* requires that agencies develop a detailed statement of potential alternatives to any proposed action. The requirement that alternatives be discussed is at the heart of the National Environmental Policy Act. *Environmental Defense Fund v. Corps of Engineers, U.S. Army,* 470 F.2d 289 (8th Cir.1972). The rationale for this requirement is that the responsible decision maker should be informed about the environmental consequences of each alternative prior to making his decision so that he may balance the extent to which an alternative meets the project's goals against the damage that will occur to the human environment. *Id.* This ensures that environmental concerns will be given due consideration before any project is approved.

The requirement that alternatives to the proposed action be discussed has been one of the most troublesome areas of NEPA litigation. *See* Grad, *Treatise on Environmental Law,* Volume 2, § 9.02, 9–104 (1983). The reason for the difficulty is that for every proposed action there are potentially an infinite number of alternatives. To require a detailed study of the environmental consequences of every conceivable alternative would effectively hamstring any agency action. As the United States Supreme Court stated in *Vermont Yankee Nuclear Power Corporation v. Natural Resources Defense Council,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978):

> Common sense also teaches us that the "detailed statement of alternatives" cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man. Time and resources are simply too limited to hold that an impact statement fails because the agency failed to ferret out every possible alternative, regardless of how uncommon or unknown that alternative may have been at the time the project was approved.

*Id.* at 551, 98 S.Ct. at 1215–16. Thus, it is clear that not *every* alternative need be discussed in detail.

■■■ To impose a pragmatic limit on the number of alternatives which must be discussed, courts have adopted a rule of reasonableness. *Vermont Yankee,* 435 U.S. 519, 551, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460 (1978). The rule of reason requires an agency to consider any alternative which is reasonable under the circumstances. A reasonable alternative is one which will effectuate the purposes of the project. *Trout Unlimited v. Morton,* 509 F.2d 1276, 1286 (9th Cir.1974). *See also Vermont Yankee,* 435 U.S. at 551, 98 S.Ct. at 1215 (1978). If an alternative does not implement the purposes of the project it certainly is not reasonable and no purpose

---

**2.** The matrix system used by the PMT is similar to that approved by the Eighth Circuit in *Minnesota Public Interest Research Group v. Butz,* 541 F.2d 1292 (1976). The court is convinced that the PMT assigned the values to each corridor in a good faith manner. The PMT consisted of persons who were experts in the area of transportation planning and design and were representing various local units of government.

would be served by requiring a detailed discussion of its environmental effects since the alternative will never be adopted. *See Crosby v. Young,* 512 F.Supp. 1363, 1373 (E.D.Mich.S.D.) ("I cannot perceive of a more useless requirement than one that would require an agency to consider alternatives in detail that are not workable....")

To determine whether Lafayette was a reasonable alternative this court must first isolate the underlying goals of the project. The broad transportation goals of the federal, state and local governments were identified by the PMT after consulting with the responsible governmental officials.[3] After the PMT identified those goals, it developed the first level evaluation criteria to determine whether a particular corridor met the overall transportation goals.

 The plaintiffs argue that during the Phase I process too much emphasis was placed upon transportation goals and objectives and not enough on environmental concerns. In determining whether plaintiffs are correct in their assertion, it must be kept in mind that this court may not engage in a *de novo* determination of the appropriate criteria against which to measure the potential corridors. *North Slope Borough v. Andrus,* 642 F.2d 589 (D.C.Cir.1980). While it is true that it is not permissible to define the goals in such a manner so as to preordain the outcome, the PMT's selection of criteria and the numerical score assigned after application of those criteria must be given some weight. *Id.* See also, *Commonwealth of Kentucky ex rel. Beshear v. Alexander,* 655 F.2d 714 (6th Cir.1981). For several reasons this court cannot agree with plaintiffs' contention that too much weight was given to transportation goals. It is clear that the Phase I process was utilized to identify

reasonable alternatives. Since a reasonable alternative is one which serves the underlying goals of a project, *Trout Unlimited v. Morton,* 509 F.2d 1276, 1286 (9th Cir.1974), and the project under consideration involved transportation it is only natural that transportation policies would predominate. As noted above, it would not serve anyone's interest to conduct a detailed environmental analysis of a corridor which was not feasible. *Crosby v. Young,* 512 F.Supp. at 1373. Moreover, many of the criteria utilized by the PMT involved environmental considerations. Out of the ten criteria used in the first level evaluation process, four of them have obvious environmental implications.[4] Thus, this court does not believe that the PMT placed too great an emphasis on transportation criteria.

After applying the criteria, the Project Management Team concluded that Lafayette was not a reasonable alternative. That is the decision which plaintiffs claim violated the National Environmental Policy Act. Although Lafayette scored third from the highest in overall score, it was significantly below the second place corridor, Shepard Road. One of the primary local needs which I–35E was designed to serve was to provide ready access to the St. Paul Central Business District from the Twin Cities airport and southwest St. Paul. Lafayette could not meet those demands. Moreover, the construction of Lafayette would have encouraged through traffic in residential neighborhoods west of the Lafayette corridor. This problem is clearly spelled out in the Phase I Report.

Plaintiffs introduced evidence through Mr. Tuncay Aydinalp that Lafayette was a reasonable alternative for the routing of I–35E. Mr. Aydinalp headed the group that prepared the Butler Report.[5] He testified that in his opinion the Lafayette corri-

---

3. The goals were taken from the Metropolitan Council's Regional Transportation Policy Plan.

4. For example, criteria 4 and 5 concern land use compatibility and development. Criteria 6 and 9, neighborhood traffic and right-of-way acquisition, required the PMT to consider the impact of I–35E on neighborhood disruption.

5. The Butler Report was an exhaustive study done several years before the PMT started preparing the Phase I Report which examined possible routes for the completion of I–35E.

dor was a reasonable alternative. However, Mr. Aydinalp's opinion about the reasonableness of Lafayette was based upon the assumption that there would be some significant traffic artery in the Pleasant Avenue corridor. Without an artery in the Pleasant Avenue corridor, the Lafayette corridor would not serve the transportation needs of the Metropolitan area.

Mr. Aydinalp's opinion was based upon his work on and the findings of the Butler Report. The assumption underlying the Butler Report was that, based upon population predictions, Dakota County would experience a massive population increase prior to the turn of the century. Because Lafayette served Dakota County and the perceived need for a major thoroughfare serving Dakota County was so great, Lafayette was rated very high. By the time the PMT prepared the Phase I Report, new population projections for Dakota County were available which indicated that Dakota County would not expand as rapidly as had previously been expected. Thus, the need for an interstate along the Lafayette corridor decreased. By the time the PMT began work on the Phase I Report, the need for a direct connection to the airport became paramount. The proposed construction of I–35E along the Pleasant Avenue corridor was designed to meet that need. Mr. Aydinalp admitted that the revised population statistics used by the PMT could have a significant impact upon the viability of Lafayette.

The testimony of three witnesses buttressed the conclusions of the Phase I Report. Richard Braun, Commissioner of the Minnesota Department of Transportation, testified that in his professional opinion the corridors excluded by the PMT were not feasible alternatives. Mr. Shrouds, one of the members of the PMT, stated that the Lafayette corridor would not serve the traffic needs of the Metropolitan area. Deane Wenger, the consultant to the PMT during Phase I, also stated that the problem with Lafayette was that it did not serve the traffic demands from southwest St. Paul or the Twin Cities airport to the downtown central business district. After

hearing all of the evidence in this case, the court finds that the plaintiffs have failed to demonstrate that the Lafayette corridor was a reasonable alternative. Since it was not a reasonable alternative, the PMT's decision to exclude it from further study after the first level evaluation was complete was not inappropriate.

The plaintiffs also argue that it was improper for the defendants not to consider "combination corridors". Combination corridors involve utilizing two distinct corridors to meet a single transportation need. The PMT did consider combination corridors but decided not to recommend them for further study for several reasons. First, the PMT wanted to be able to compare comparable corridors. Second, including combination corridors would greatly expand the number of possible routes and further complicate the process. Finally, all of the combination corridors required a significant traffic artery in the Pleasant Avenue corridor. The decision not to recommend combination corridors was within the PMT's discretion. *See e.g. Vermont Yankee*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

## IV.

### BIAS

The plaintiffs have consistently maintained that two officials involved in the preparation and approval of the EIS, Deane Wenger, a staff person for the PMT and Commissioner of the Minnesota Department of Transportation, Richard Braun, demonstrated a preexisting bias to selecting the Pleasant Avenue corridor. After examining the evidence, this court agrees that both Mr. Wenger and Mr. Braun may not have been subjectively impartial. However, NEPA does not require, or even contemplate, that decision makers will be completely impartial. *Environmental Defense Fund v. Corps of Engineers, U.S. Army*, 470 F.2d 289 (8th Cir. 1972). In fact, NEPA assumes that institutional biases will exist and requires that an

EIS be prepared to insure that the decision maker cannot avoid coming to grips with the environmental consequences of the proposed action. *Id.* at 295–96. In the present case, Mr. Wenger was a staff person who had no decision making authority. Commissioner Braun was a career highway department employee prior to becoming Commissioner and the completion of I–35E was one of the most significant responsibilities of that agency. For a person with Mr. Braun's experience in state highway matters to be completely indifferent to the routing of I–35E would be an indication that he was derelict in his duties rather than a sign that he was capable of making a reasoned decision. Though Commissioner Braun may have had a slight institutional bias favoring Pleasant Avenue, the plaintiffs did not introduce evidence showing that it rose to the level that he was incapable of making a good faith objective decision.

## V.

### ADEQUACY OF EIS

▆▆▆ The plaintiffs also claim that the environmental impact statement was inadequate because it failed to discuss in sufficient depth the impact I–35E would have upon noise levels, air quality, and soil lead concentrations. For an environmental impact statement to be adequate it must contain sufficient information to put a decision maker on notice as to the environmental consequences of the proposed action. *Sierra Club v. Froehlke,* 534 F.2d 1289, 1296 (8th Cir.1976). This requirement comports with the purpose of NEPA which is to force decision makers to take a "hard look" at the environmental consequences of a proposed action before approving the project. The EIS cannot be vague or conclusory, *EOF v. Froehlke,* 473 F.2d 346 (8th Cir.1972), but it need not be exhaustive. *Iowa Citizens for Environmental Quality, Inc. v. Volpe,* 487 F.2d 849 (8th Cir.1973). Again, the inquiry must be bounded by notions of reasonableness. *Id.* Moreover, the burden is on the plaintiffs to demonstrate by a preponderance of the evi-

dence that the EIS was inadequate. *Sierra Club v. Froehlke,* 534 F.2d 1289, 1300 (8th Cir.1976). With that brief review in mind, the court will examine the evidence presented at trial.

### A. NOISE LEVELS

The plaintiffs' first attack upon the adequacy of the environmental impact statement is that the EIS did not adequately analyze the impact I–35E would have on noise levels in neighborhoods near the Pleasant Avenue corridor. In support of their argument, plaintiffs point out that many of the noise surveys were done for only 15 minutes, the surface of the road was not disclosed, there were no projections for worst case noise years, and no mitigative measures were considered for construction noise.

▆▆▆ The plaintiffs introduced evidence, through an expert witness, that a test done for only 15 minutes is not an accurate prediction of future noise levels. However, the defendants responded with an expert of their own claiming that a 15 minute noise test is sufficient to accurately predict future noise levels. The court finds that both the plaintiffs and defendants' witnesses are credible witnesses who happen to represent divergent viewpoints of a scientific debate. The National Environmental Policy Act does not require scientific unanimity. *Life of the Land v. Brinegar,* 485 F.2d 460, 473 (9th Cir.1973). Where there is a legitimate debate such as in the present case, the agency responsible for preparing the EIS must make a decision and this court will not substitute its judgment for that of the agency's. Moreover, the EIS discloses the duration of the tests and also states that longer intervals were tried with substantially similar results.

The failure of the defendants to disclose the surface material of the road is another area where there is considerable dispute. The plaintiffs claim that whether a road is made of concrete or asphalt has a significant effect upon the amount of noise given off by a freeway. However, the defend-

ants' expert witness testified that though there might be some difference in noise levels on a new surface, after several years of wear and tear the difference is negligible.

The failure to consider mitigation measures during construction and the lack of any projections for "worst case noise years" are of very little consequence and do not rise to the level of omissions which would justify a finding that the EIS is inadequate. Moreover, nearly all of the concerns raised by the plaintiffs' expert, Mr. Alfonso Perez, were contained in a letter sent to the Metropolitan Council in 1980 by Mr. Perez. That letter was included in the Comment/Response section of the environmental impact statement. The inclusion of Mr. Perez's objections in the EIS serves to foster the goals of NEPA by making divergent points of view known to the decision maker so that he may make a reasoned choice among various alternatives. *See generally Iowa Citizens for Environmental Quality, Inc. v. Volpe,* 487 F.2d 849 (8th Cir.1973).

To determine if the noise analysis done by the defendants was adequate, a court must look not only at what was omitted but also at what was included. The Preliminary Noise Analysis Report, which was incorporated into the EIS by reference, is a 64 page document containing extensive analysis of the impact I–35E would have on noise levels in the surrounding area. The Preliminary Noise Analysis Report was condensed into a 14 page section of the environmental impact statement. There is more than enough information in the EIS to inform a decision maker of the effect I–35E will have on noise levels in and around the Pleasant Avenue corridor.

## B. AIR QUALITY

The plaintiffs' challenge to the air quality section of the EIS focused upon the alleged inadequacy of the defendants to fully consider the impact of carbon monoxide. The defendants conducted the carbon monoxide study using two computer models known as Hiway I and Hiway II. Both of those models have been approved by the Environmental Protection Agency. The defendants first conducted their carbon monoxide study using the Hiway I model. Hiway I showed several violations. The study was recomputed using the Hiway II model which showed no violations. The plaintiffs contend this was an improper manipulation of data to achieve a desired outcome. The defendants' reason for recomputing under Hiway II was that Hiway I tends to significantly overestimate carbon monoxide concentrations. Both methods are appropriate and the Hiway II model did not reveal any violations of the applicable carbon monoxide standards.

The plaintiffs also placed heavy emphasis on documents which state that the background air monitoring was being done for "political" reasons. There was conflicting evidence as to what inference the court could draw from these documents. The plaintiffs argue that the reference to air quality monitoring being done for "political" reasons meant that the defendants were not serious about testing air quality and were determined to build I–35E in the Pleasant Avenue corridor. However, Ms. Lynne Bly, an air quality specialist for the Metropolitan Council, testified that the assumptions underlying the air quality monitoring tended to overestimate the amount of carbon monoxide in the atmosphere. The defendants claim that the reference to air quality monitoring being done for "political" reasons merely meant that the tests conducted were far greater than required by law and were being done for good public relations; to allay any concerns shared by people living in the area. After hearing the testimony and reviewing the extensive documentation contained in the air quality report and the EIS, the court is convinced that the defendants conducted the air quality report in good faith.

The plaintiffs also introduced evidence concerning the effect of carbon monoxide on patients at United Hospitals, a hospital located directly adjacent to the Pleasant Avenue corridor. Dr. Davitt Felder, a surgeon with patients at United, testified that

he thought that completion of I–35E along the Pleasant Avenue corridor with high density traffic would cause the air intake systems to take in substances that would impair the health of his patients. Several points about Dr. Felder's testimony are worth noting. Dr. Felder was not representing United Hospitals but rather was speaking on behalf of his own patients. Moreover, United Hospitals undertook a $72 Million Dollar rebuilding program right next to the Pleasant Avenue corridor after the right-of-way for the Pleasant Avenue corridor had been acquired. Finally, Dr. Felder admitted that he knew very little about air quality monitoring.[6]

■ The EIS included a detailed analysis of most of the concerns raised by Dr. Felder. Not only did the EIS examine the impact I–35E would have on United Hospitals but it discussed the potential impact carbon monoxide emissions would have on nearly every health care facility near the Pleasant Avenue corridor. Dr. Felder's testimony is little more than an opinion that the EIS was wrong in concluding that there would not be significant harmful effects due to increased carbon monoxide in the atmosphere. However, the EIS is a procedural requirement designed to inform the decision maker. *Environmental Defense Fund v. Hoffman*, 566 F.2d 1060 (8th Cir.1977). The mere fact that people may disagree with the conclusions expressed in the EIS does not make it defective. *Life of the Land v. Brinegar*, 485 F.2d 460, 473 (9th Cir.1973). In the present case, both the detailed air quality report and the section on air quality in the EIS provided adequate information for a decision maker to understand the impact I–35E would have on the surrounding air quality. That is all the law requires. *County of Suffolk v. Secretary of Interior*, 562 F.2d 1368, 1375 (2d Cir.1977).

## C. LEAD

■ The plaintiffs also challenge the adequacy of the EIS on the ground that it did not discuss the dangers to human health caused by the accumulation of soil lead from automobile exhaust. Dr. Howard Mielke, an expert called by the plaintiffs, testified extensively about the harmful effects of soil lead. The court wishes to note that it does not question the sincerity of Dr. Mielke's belief. However, the zeal with which he testified leads this court to find his testimony less than persuasive. Moreover, an exhaustive study of every minor potential environmental impact is not required. *Farmland Preservation Association v. Goldschmidt*, 611 F.2d 233 (8th Cir.1979). This court is not convinced that a study concerning the toxic effects of soil lead concentrations along the Pleasant Avenue corridor was a necessary part of the EIS.

## VI.

## SUBSTANTIVE REVIEW

■ Though the duty of a court in a NEPA action challenging the adequacy of an EIS is primarily procedural, courts also engage in limited substantive review of the agency's decision. In exercising substantive review the role of a court is extremely limited. This court cannot substitute its judgment for that of the agency charged with that responsibility. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519 (1978). A reviewing court must look at two factors in determining whether an EIS is adequate. The first is whether the responsible agency reached its decision after a good faith balancing of environmental factors and second, whether the agency's "actual balance of costs and benefits was arbitrary or clearly gave insufficient weight to environmental values." *Minnesota Public Interest Research Group v. Butz*, 541 F.2d 1292 (8th Cir.1976).

In the present case, the agency balanced the costs and benefits of several alterna-

---

**6.** It is significant that Dr. Felder is a member of RIP 35E who lives immediately adjacent to the Pleasant Avenue corridor.

tives and chose Pleasant Avenue. One function of this court is to determine whether, in approving Pleasant Avenue, the responsible agencies clearly gave insufficient weight to environmental facts. This court does not believe they did.

■ It is clear that the Pleasant Avenue corridor met the transportation needs of the federal, state, and local governments. That is demonstrated not only by the Phase I Report but also by the Butler Report which concluded that Pleasant Avenue was the best site for the completion of I–35E. As early as the start of the Phase I process, the PMT gave serious consideration to environmental concerns. The plaintiffs contend that Lafayette and other corridors were excluded too early in the process to determine the extent to which they met the transportation goals of the Metro area and the extent to which they posed a danger to the environment. However, it must be kept in mind that the PMT was not writing on a clean slate. By the time the PMT started working on the Phase I Report, Pleasant Avenue had been designated as the site for the proposed completion of I–35E for nearly 20 years and the extensive environmental analysis contained in the Butler Report was available to them. In addition to the DEIS and the FEIS, there are numerous subreports which review in detail special topics such as noise and air impacts. The overall impression of this court is that the EIS is a detailed, well documented report which far exceeds the minimum requirements of an EIS. Moreover, after reviewing the EIS this court cannot say that the responsible agencies gave insufficient weight to environmental factors.

## VII.

### HISTORICAL SITE

The plaintiffs allege that in approving the Pleasant Avenue corridor the defendants violated 49 U.S.C. § 1653(f) of the Department of Transportation Act. Section 4(f) of the Department of Transportation Act provides that the Secretary of Transportation shall not approve any project requiring the use of historical sites unless there is no feasible alternative to use of the land and the project includes all possible planning to minimize harm. 49 U.S.C. § 1653(f).

■ Section 4(f) is triggered when the Secretary of Transportation is asked to approve a transportation program which requires the *use* of historical sites. *Adler v. Lewis,* 675 F.2d 1085, 1091 (9th Cir.1982). In the present case there has been no physical taking of historical sites. However, since many projects affect historical sites without actually using the site, courts have developed the doctrine of "constructive use". The doctrine of "constructive use" merely requires the 4(f) statement to be filed when the off-site activities of a project substantially affect the historical significance of a site. *Id.* at 1092. The plaintiffs bear the burden of demonstrating that a project will involve constructive use of a historical site. *Arkansas Community Org. for Reform Now v. Brinegar,* 398 F.Supp. 685, 692 (E.D.Ark.1975), affirmed, 531 F.2d 864 (8th Cir.1976).

■ In the present case, though plaintiffs allege constructive use of nearly 100 historic sites, the evidence fairly establishes that there is a controversy only as to two: the James J. Hill mansion lower retaining wall and the German Bethlehem Presbyterian Church. The James J. Hill mansion is a 45-room mansion overlooking downtown St. Paul that was built in 1888. The German Presbyterian Church is located at the foot of Ramsey Hill immediately adjacent to the Pleasant Avenue corridor. Plaintiffs did not and could not demonstrate that either of these properties would be actually used in the construction of I–35E. Thus, for § 4(f) to apply, plaintiffs are required to show that the incidental effects of I–35E will have a substantial impact upon the historical sites at issue. The plaintiffs failed to carry their burden. There was very little, if any, testimony concerning the extent to which I–35E would have an impact upon the Hill mansion retaining wall or the German Presby-

terian Church. Accordingly, this court concludes that § 4(f) is not applicable.

■ Even if § 4(f) were applicable, the defendants have substantially complied with its requirements in the EIS by discussing proposed alternatives and methods to minimize harm to historical sites. The original design of I–35E in the Pleasant Avenue corridor required the actual use of parts of the Hill mansion retaining wall and the German Presbyterian Church. The environmental impact statement considered several different design options and finally adopted the one which completely avoided the use of either the Hill mansion retaining wall or the German Presbyterian Church. This process comports with the requirement of § 4(f) which is to utilize all available measures to avoid harming historical sites. Accordingly, even if § 4(f) were applicable, the defendants have complied with its provisions.

## VIII.

### STATUTORY AUTHORITY OF COMMISSION

Minn.Stat. § 161.1245 states that:

The commissioner of transportation is authorized to construct a four-lane parkway with limited access along the right of way of Route No. 382 in the City of St. Paul. The commissioner shall not construct any highway on Route No. 382 or connection to Route No. 392 other than that described in this subdivision.

Route No. 382 (The Pleasant Avenue corridor) extends to the intersection of Pleasant Avenue and Kellogg Boulevard. Minn. Stat. § 161.117 (1982). The plaintiffs contend that § 161.1245 prohibits the Commissioner from building approximately one half mile beyond the intersection of Pleas-

ant Avenue and Kellogg to the direct connection with I–94.

■ In 1982 the Minnesota Legislature amended Minn.Stat. § 161.1245 striking the portion of the statute that prohibited the direct connection with I–94. The obvious purpose of the amendment was to permit the Commissioner to connect the proposed parkway in the Pleasant Avenue corridor with I–94. The language in Minn.Stat. § 161.1245 which provides that "[t]he commissioner shall not construct any highway on Route No. 382 or connection to Route No. 392 other than that described in this subdivision" simply means that any facility constructed on Route 382 must be a parkway. It does not prohibit the commissioner from connecting the Pleasant Avenue corridor to I–94.

Plaintiff's final argument[7] is that the Commissioner is acting outside his authority because Minn.Stat. § 161.1245 permits only a four-lane parkway to be built in the Pleasant Avenue corridor and at certain points the defendants are building a six-lane facility. This court has previously addressed this issue. On December 9, 1983, this court held a hearing on plaintiffs' motion for a preliminary injunction in which they asserted that the defendants were building a six-lane facility. The court denied the motion for a preliminary injunction largely because the plaintiffs failed to meet the equitable requirements for the issuance of a preliminary injunction. *Dataphase Systems, Inc. v. C.L. Systems, Inc.*, 640 F.2d 109 (8th Cir.1981). *See* Civil File No. 3–83–346, December 9, 1983 Order. The issue is presently before this court without the procedural barriers imposed by a request for preliminary injunctive relief.

■ Minn.Stat. § 161.1245 permits the Commissioner to construct a four-lane parkway in the Pleasant Avenue corridor. It does not define the term "four-lane park-

---

7. The plaintiffs have raised numerous other issues in their complaint. However, the issues which appear in this memorandum are those identified by the plaintiffs in their post trial statement of issues. The court has examined the remaining issues and in each case either the plaintiffs did not introduce evidence in support of the allegation or failed to introduce sufficient evidence. Accordingly, none of the remaining

way." The affidavits [8] submitted from both parties indicates that the extra lanes under construction in the Pleasant Avenue corridor are auxiliary lanes designed to provide space for lateral traffic movement between closely connected exit and entrance ramps. The auxiliary lanes are between 900 and 1600 feet long. The court is not convinced that the statute, by authorizing construction of a four-lane parkway, prohibits the Commissioner of the Minnesota Department of Transportation from exercising minimum caution in designing its safety features. Thus, the construction of the auxiliary lanes does not violate Minn. Stat. § 161.1245.

## IX.

## CONCLUSION

The National Environmental Policy Act was adopted, at least in part, because of the growing concern for the destruction of the natural environment caused by the building of the interstate system. This lawsuit represents a classic application of that Act: a neighborhood association representing people living next to a proposed site has sought judicial review of the agency's decision. The duty of this court is not to decide where interstates should be placed. That is the job of the responsible agency. This court's duty is merely to insure that in the process of making the selection the agency considered reasonable alternatives and the environmental consequences that would flow from its decision. After listening to extensive testimony and reviewing hundreds of documents, this court is convinced that the defendants prepared the environmental impact statement in a reasonable manner, giving due consideration to environmental concerns. Accordingly, IT IS ORDERED that:

1. Plaintiffs' request for injunctive relief is denied.

### APPENDIX A

### FIRST–LEVEL EVALUATION OF POTENTIAL 1–35E CORRIDORS

Transportation Criteria Number

| CORRIDOR | 1 | 2 | 3 A | 3 B | 4 | 5 | 6 | 7 A | 7 B | 7 C | 8 A | 8 B | 9 | 10 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Pleasant Ave. | 2 | 5 | 5 | 5 | 5 | 4 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 66 |
| Shepard Road | 1 | 5 | 2 | 5 | 4 | 5 | 2 | 4 | 4 | 4 | 5 | 5 | 4 | 5 | 55 |
| Lafayette Freeway (TH3) | 2 | 3 | 2 | 3 | 3 | 4 | 2 | 4 | 3 | 2 | 4 | 3 | 2 | 5 | 42 |
| Short Line/ I–94 | 2 | 5 | 2 | 3 | 3 | 3 | 2 | 3 | 2 | 2 | 3 | 3 | 1 | 5 | 39 |
| Concord | 3 | 1 | 1 | 2 | 2 | 3 | 1 | 3 | 3 | 2 | 3 | 2 | 2 | 4 | 32 |
| TH 61 | 3 | 1 | 1 | 1 | 1 | 4 | 1 | 2 | 2 | 1 | 2 | 1 | 4 | 4 | 28 |
| I–494/694 | 4 | 1 | 1 | 1 | 1 | 5 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 4 | 24 |

Criteria

1: Cost

2: Truck accessibility within subregions

allegations afford a basis for granting injunctive relief.

8. The parties stipulated that the court could decide this issue based upon the affidavits submitted for the December 9, 1983 preliminary injunction hearing.

Criteria

3: Interregional truck accessibility

4: Support provided to land use development

5: Compatibility within one-half mile of land-use dev.

6: Traffic in neighborhoods

7: Travel time for public and multi-passenger transit to St. Paul Cent. Bus. Dist.
 A. City of St. Paul
 B. Northern Dakota County
 C. Northwestern Dakota County

8: Travel time from any part of Rural Service Area to St. Paul Cent. Bus. Dist.
 A. Subregion 11
 B. Subregion 12

9: Design and right-of-way problems and adjacent fringe parking

10: Accommodation to intrastate travel